449 F.2d 567
 John ROCKBRIDGE and Henry Zah, Individually and On Behalf of
All Others Similarly Situated, Plaintiffs and Appellants,
v.
Anthony LINCOLN, Area Director, Bureau of Indian Affairs, et
al., Defendants and Appellees.
 No. 25437.
 United States Court of Appeals,
Ninth Circuit.
 Sept. 1, 1971.
 
 1
 Donald Juneau (argued), Theodore R. Mitchell, Window Rock, Ariz., for appellants.
 
 
 2
 George R. Hyde (argued), S. Billingsley Hill, Dept. of Justice; Shiro Kashiwa, Asst. Atty. Gen., Land & Nat. Resources Div., Washington, D. C.; Richard K. Burke, U. S. Atty., Michael Lasher, Asst. U. S. Atty., Phoenix, Ariz., for appellees.
 
 
 3
 Before MERRILL and ELY, Circuit Judges, and FERGUSON,* District Judge.
 
 FERGUSON, District Judge:
 
 4
 The question presented is whether a system of unregulated trading post monopolies allegedly imposed upon the Navajo Indians by governmental officials can be challenged in court. The district court held that it lacks jurisdiction. We reverse.
 
 
 5
 This appeal, pursuant to 28 U.S.C. Sec. 1291, is from a judgment dismissing appellants' action to require the Secretary of the Interior, the Commissioner of Indian Affairs, and the Area Director of the Navajo Indian Reservation to adopt and enforce certain rules and regulations governing traders doing business on the Navajo Indian Reservation. The appellants filed their complaint as a class action on their own behalf and on behalf of all Navajo Indians residing on the reservation.
 
 
 6
 Appellants claim that a duty to adopt and enforce such regulations arises out of 25 U.S.C. Secs. 261 and 262. The appellees contend that the sections grant them such discretion within the meaning of the Administrative Procedure Act (5 U.S.C. Sec. 701 et seq.) as to preclude litigation. These sections provide as follows:
 
 
 7
 "Sec. 261. Power to appoint traders with Indians
 
 
 8
 "The Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians."
 
 
 9
 "Sec. 262. Persons permitted to trade with Indians
 
 
 10
 "Any person desiring to trade with the Indians on any Indian reservation shall, upon establishing the fact, to the satisfaction of the Commissioner of Indian Affairs, that he is a proper person to engage in such trade, be permitted to do so under such rules and regulations as the Commissioner of Indian Affairs may prescribe for the protection of said Indians."
 
 
 11
 By their motion to dismiss, the appellees concede for the purpose of this appeal the truthfulness of the allegations set forth in the complaint. Delesdernier v. O'Rourke & Warren Company, 305 F.2d 929 (5th Cir. 1962). In summary, these allegations are:
 
 
 12
 1. The Navajo Reservation is approximately the size of West Virginia, and is occupied by 120,000 Navajos.
 
 
 13
 2. No one is allowed to conduct business on the reservation without the approval of the Commissioner of Indian Affairs. There are now approximately 100 traders, whose total gross receipts during the past six years averaged 14.5 million dollars per year.
 
 
 14
 3. Family income for the Navajos averages $1,500 per year. The effective unemployment rate is nearly 80%.
 
 
 15
 4. The trading post is the only area outlet for groceries and supplies. It is the only local buyer for livestock, wool and other Navajo products. It has the only telephone, gasoline pump and post office and is the only local source of credit by loans, pawns and open accounts.
 
 
 16
 5. The trader dominates the relationship between the Navajos and those outside the reservation to his own economic advantage. The trader frequently acts as liaison between state welfare agencies and the Navajo applicants and withholds proceeds of welfare checks or other checks sent to them until their loans are paid.6. The United States Railroad Retirement Board employs traders to act as special claims agents. In this capacity, the trader disperses one of the few sources of wage income on the reservation. He is able to, and often does, favor the employment of those Navajos who have credit accounts owing to him.
 
 
 17
 7. Because of the licensing procedures of the Commissioner, each trader has an effective geographical monopoly of Navajo consumers and resources in his trading area, which works to the benefit of the trader and against the Navajos.
 
 
 18
 8. It is not possible for the Navajos to trade outside the reservation because the vast majority of roadways are unpaved and in winter months and during spring and fall rains, transportation is difficult to impossible.
 
 
 19
 9. The traders have a legal monopoly, since they have a captive market and need not worry about competition. They are not subject to the controls of the free enterprise system.
 
 
 20
 10. The unregulated trading post system permits the trader to exact unduly high prices for his goods; to sell inferior products; to charge any rate of interest; and to use dishonest weights and measures. The system permits the trader economically to manipulate the Navajo.
 
 
 21
 11. While the Commissioner leaves traders on the Navajo, Hopi and Zuni Reservations free from price regulation, he subjects traders on other Indian Reservations to price controls.
 
 
 22
 12. The Commissioner has issued a few regulations concerning relatively unimportant features of the trading post operation, such as, the issuance of pawn receipts, with no regulation of interest rates. He requires that prices be plainly marked, but places no restraint on prices, and he has provided no means whatsoever to enforce even the few regulations which have been adopted.
 
 
 23
 The appellants seek orders which would (1) require the appellees to adopt adequate rules and regulations which govern traders on the reservation for the protection of the Navajos, including specification of "the kind and quantity of goods and the prices at which such goods shall be sold"; and (2) require appellees to enforce those regulations and the regulations which are now in effect.
 
 
 24
 Appellants allege jurisdiction under a variety of statutes, treaties and constitutional provisions. They are 25 U.S.C. Secs. 261-264; Article 1, Sec. 8, clause 3 of the Constitution; the Fifth Amendment; Treaty of 1849 between the Navajo Tribe and the United States (9 Stat. 974); Navajo Treaty of 1868 (15 Stat. 667); the Administrative Procedure Act, 5 U.S.C. Sec. 701 et seq.; 28 U.S.C. Sec. 1331, involving a federal question and $10,000; 28 U.S.C. Sec. 1361, the Mandamus Statute; and 28 U.S.C. Sec. 1651, the All Writs Statute.
 
 
 25
 The district court granted the appellees' motion to dismiss holding that the Administrative Procedure Act (5 U.S.C. Sec. 701 et seq.) did not confer jurisdiction on the court. The court reasoned that 25 U.S.C. Secs. 261 and 262 are purely discretionary and therefore specifically exempted from the Act. The district court further held that the Mandamus Statute (28 U.S.C. Sec. 1361) was likewise inapplicable, and that since the appellees had not "acted" in violation of their statutory powers, the doctrine of sovereign immunity is a bar to the action.
 
 
 26
 We hold that the district court has jurisdiction under the Administrative Procedure Act, and that the doctrine of sovereign immunity is not a bar to this action.
 
 
 27
 Section 702 of the Administrative Procedure Act (5 U.S.C. Sec. 702) provides that "[a] person suffering legal wrong because of agency action * * * is entitled to judicial review thereof". Section 703 sets forth that "[t]he form of proceeding for judicial review is * * * any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction. * * *" Section 706 (1) directs the reviewing court to "compel agency action unlawfully withheld". The Act has been interpreted to permit the relief sought. Mollohan v. Gray, 413 F.2d 349 (9th Cir. 1969); United States v. Walker, 409 F.2d 477 (9th Cir. 1969); Adams v. Witmer, 271 F.2d 29 (9th Cir. 1959). Appellees contend, however, that this is a case within 5 U.S.C. Sec. 701(a) (2), which provides that the Act is not applicable when "agency action is committed to agency discretion by law". Whether agency action is "committed to agency discretion" depends upon whether Congress has manifested in the statutes governing the agency action in question an intent to cut off review. See 4 Davis, Administrative Law Treatise Sec. 28.16; Jaffe, Judicial Control of Administrative Action 374-75 (1965). A permissive statutory term, like "as he may deem just and proper", 25 U.S.C. Sec. 261, is not by itself to be read as a congressional command precluding judicial review. The question is whether nonreviewability can fairly be inferred from the over-all statutory scheme. Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).
 
 
 28
 In order to properly determine whether inaction is "* * * committed to [the Commissioner's] discretion" by Sections 261 and 262, it is thus necessary first to focus upon the legal relationship between the United States and the Indians. In Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831), Chief Justice Marshall set forth that relationship. "[The Indians] are in a state of pupilage; their relationship to the United States resembles that of a ward to his guardian." 30 U.S. at 17. In United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886), the duty of the government was defined. "From their [the Indians'] very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power." 118 U.S. at 384, 6 S.Ct. at 1114. See also Choctaw Nation v. United States, 119 U.S. 1, 75 S.Ct. 75, 30 L.Ed. 306 (1886).
 
 
 29
 In Seminole Nation v. United States, 316 U.S. 286, 62 S.Ct. 1049, 96 L.Ed. 561 (1942), the Court stated:
 
 
 30
 "In carrying out its treaty obligations with the Indian tribes, the Government is something more than a mere contracting party. Under a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, is has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards." 316 U.S. 296-297, 62 S.Ct. 1054.
 
 
 31
 More recently, in Warren Trading Post Co. v. Arizona Tax Comm'n, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), the Court held that Congress has so broadly occupied the field of trading with Indians on reservations that no room remained for state laws imposing additional burdens on traders.
 
 
 32
 The lengthy debate in Congress in 1876 which preceded the passage of Section 261 centered around two basic issues: (1) Whether the Interior Department or the War Department ought to have control over trading posts on Indian Reservations, and (2) what could be done to protect the Indians from exploitation by unethical traders. 4 Cong.Rec. (44th Cong. June 20, 1876) pp. 3906-3926.
 
 
 33
 The Bureau of Indian Affairs was under the control of the War Department from 1789 to 1849, at which time it was transferred to the Interior Department. During the debates of 1876, approval was sought for an amendment, initially approved in the House, transferring the Bureau of Indian Affairs back to the War Department. A considerable portion of the debate on this suggestion centered around the abuses visited upon the Indians by traders during the period of time when the War Department previously had control. The comments of Senator Logan regarding those abuses are set forth in Appendix A.
 
 
 34
 In discussing a related amendment regarding the issuance of trading licenses by the Commissioner, which was subsequently agreed to and became a part of the Bill, Congressman Magninis set forth in explicit detail the injustices which had occurred as the result of unregulated monopolies in the Indian trading post system. His statement, in part, is set forth in Appendix B.
 
 
 35
 Shortly after the statements of Senator Logan and Congressman Magninis, Congressman Randall submitted the report of the conference committee to the House. It, in part, recommended the adoption of the following:
 
 
 36
 "Sec. 5. And hereafter the Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper, specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." 4 Cong.Rec. (44th Cong. August 11, 1876) p. 5477.
 
 
 37
 As noted earlier, the House previously had voted to transfer the Bureau of Indian Affairs back to the War Department. Section 5 remained unchanged through the subsequent conference committees and ultimately became Sec. 261.
 
 
 38
 When viewed in light of this historical background, the language of Sec. 261 becomes much clearer. When it states that the Commissioner is to have "sole" power to license and regulate traders, it means that he, as opposed to the War Department or some other federal administrative official, has that power.
 
 
 39
 In addition to centering power in the commissioner, Congress acted to prevent the widespread abuses within the existing unregulated trading post system revealed by the debates. There can be no question but that when Congress enacted Sec. 261 it intended that the Commissioner would "specify[ing] the kind and quantity of goods and the prices at which such goods shall be sold to the Indians". Congress delegated to the Commissioner the task of determining the specific content of these regulations. This does not mean that the Commissioner has unbridled discretion to refuse to regulate, but rather that he shall exercise discretion in deciding what regulations to promulgate and in determining specific quantities, prices and kinds.
 
 
 40
 This conclusion is not only consistent with the clear purpose of Congress, but also demanded by traditional rules of statutory construction. If Congress had intended that the Commissioner's discretion would be unlimited, then much of the language in Sec. 261-"specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians"-would be superfluous. It is a cardinal principle of statutory construction that whenever possible statutes are to be given such effect that no clause, sentence or word is rendered superfluous, void, contradictory or insignificant. Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).
 
 
 41
 Moreover, statutes passed for the benefit of dependent Indian tribes and communities are to be liberally construed in favor of the Indians, and any doubt as to the proper construction is to be resolved in the latter's favor. Squire v. Capoeman, 351 U.S. 1, 6-7, 76 S.Ct. 611, 100 L.Ed. 883 (1956); Holt v. Commissioner of Internal Revenue, 364 F.2d 38 (8th Cir. 1966), cert. denied, 386 U.S. 931, 87 S.Ct. 952, 17 L.Ed.2d 805 (1967).
 
 
 42
 Section 262 was enacted in 1903, twenty-seven years after section 261. While there is no statutory history to aid in interpreting this section, a careful reading suggests two possible interpretations. First, the provision "under such rules and regulations as the Commissioner of Indian Affairs may prescribe for the protection of said Indians", may be read as a grant of authority to the Commissioner allowing him to promulgate rules in addition to those already required by Sec. 261, i. e., rules unrelated to the price, quantity or kind of goods sold by the traders. Apparently the Commissioner took this view in acting to regulate the issuance of pawn tickets. Such regulation, while of doubtful propriety under Sec. 261, is clearly authorized by Sec. 262.
 
 
 43
 A second possible interpretation of this provision is that Congress intended to limit the Commissioner's discretion in rule making to those rules and regulations which are "for the protection of said Indians". Thus, for instance, he could not act in the trader's interest, but only for the protection of the Indian. These two interpretations are not in any way inconsistent with each other, and it seems likely that both were intended. However, neither is necessary for the resolution of this case in its present posture.
 
 
 44
 In sum, the legislative history does not support the contention that the regulations promised under Secs. 261, 262 are wholly within the discretion of the Commissioner and thus immune from judicial review. The history demonstrates that the statutes in question were passed with a specific set of legislative objectives in mind and that the lawfulness of the Commissioner's exercise of discretion-his decisions to regulate or not to regulate in any particular instance, as well as the particular mode of regulation chosen-is to be determined by reference to these objectives. See generally, Citizens to Preserve Overton Park, Inc. et al. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). There the Supreme Court set forth the scope of judicial review under the Administrative Procedure Act as follows:
 
 
 45
 "Scrutiny of the facts does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority. Section 706(2) (A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. Sec. 706(2) (A) (Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. L. Jaffe, supra, at 182. See McBee v. Bomar, 296 F.2d 235, 237 (CA 6 1961); In re Josephson, 218 F.2d 174, 182 (CA 1 1954); Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D.Calif.1968). See also Wong Wing Hang v. Immigration & Naturalization Serv., 360 F.2d 715, 719 (CA 2 1966). Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." 401 U.S. at 416, 91 S.Ct. at 823.
 
 
 46
 The Administrative Procedure Act may not, however, provide a basis for review of governmental decisions if the doctrine of sovereign immunity is controlling so as to bar the suit. This court's position on this issue and a detailed discussion of the relevant Supreme Court decisions was fully set forth in Judge Ely's opinion in State of Washington v. Udall, 417 F.2d 1310 (9th Cir. 1969).
 
 
 47
 In dismissing the instant action, the district court stated that "[s]ince the federal officers have not 'acted' in violation of their statutory powers, sovereign immunity is a bar to this suit". This conclusion can be interpreted in two ways. First, it may be no more than a restatement of the court's prior conclusion that the appellees were free to act or not to act in their discretion. Alternatively, it might mean that far from acting in excess of their authority, at the very worst the appellees acted well within their authority. In other words, they underacted, rather than overacted.
 
 
 48
 It is traditionally said that a suit is not violative of the doctrine of sovereign immunity if (1) the officer's powers are limited by statute and he acts in excess of that authority or ultra vires; or (2) the officer was acting unconstitutionally or pursuant to an unconstitutional grant of authority. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689-691, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). However, for the purposes of sovereign immunity, this court can see no valid distinction between the public official who has a statutory duty to act and does not and the one who has a duty not to act and does. This was clearly the view of Congress in enacting the Administrative Procedure Act, since it provides that a reviewing court should "compel agency action unlawfully withheld". 5 U.S.C. Sec. 706(1).
 
 
 49
 Of course, here, as in all other suits to compel actions on the part of federal officials, some suits must be dismissed "even though the officers were not acting pursuant to valid statutory authority, because the relief sought would work an intolerable burden on governmental functions, outweighing any consideration of private harm." State of Washington v. Udall, supra, 417 F.2d at 1318.
 
 
 50
 Appellants are not seeking money damages from the government, nor are they seeking to assert some right against it or to block a government project. The relief they seek does not in any way affect the sovereign power of the United States. The government is not asked to give up a right, to grant a concession, to dispose of property or to relinquish authority. Appellants merely seek a court order directing certain government officials to perform acts which Congress has already directed those officials to perform-the promulgation and enforcement of certain rules. In light of the legislative history and the remedy sought, it can hardly be argued that the relative equities and burdens in the present case are such that sovereign immunity ought to preclude consideration on the merits.
 
 
 51
 Finally, as stated in State of Washington v. Udall, supra, "[u]nder the foregoing principles, since sovereign immunity did not require dismissal of the complaint in this case, District Court jurisdiction also existed under the federal question and declaratory judgment statutes, 28 U.S.C. Secs. 1331, 2201, and under the mandamus statute, 28 U.S.C. Sec. 1361." 417 F.2d at 1320.
 
 
 52
 The case is reversed and remanded to the district court, with directions to assume complete jurisdiction over the controversy. In the event that after a trial on the merits the appellants are entitled to relief, the district court has jurisdiction to enter such decrees as will protect the Navajo Indians in their relationship with the traders on the reservation within the guidelines that Congress has prescribed.
 
 APPENDIX A
 Statement of Senator Logan:
 
 53
 "Reference has been made to extortions and wrongs perpetrated upon the Indians under the present system. That there are errors which need correction I will not deny; but let us refer to some of the prices paid by the Indians for articles under the old regime.
 
 
 54
 "I call the attention of the Senate to a report which I have here, and I have copied it from the papers accompanying the report of 1834, made to the Congress of the United States already referred to. I find that at Fort Leavenworth, within easy reach of the markets, guns which cost in Saint Louis $7 were sold to the Indians for $30 apiece; axes costing thirtyseven and a half cents were turned over to them for $2 apiece. A double handful of salt-for that was the way they measured it then to the Indian-costing sixty-two cents a bushel, was turned over to the Indians for $1. Five and six gallon kettles, costing twentyfive cents per pound, sold for $12 apiece by the War Department to the Indians. On the navigable waters of the Upper Missouri a yard of strouding, costing $1.80, sold for $8; a blanket costing $3 sold for $10; calico costing sixteen cents per yard sold for $1; powder costing thirty cents per pound sold for $1.50; tobacco costing from five to seven cents sold for $1; blue strouding costing eighty cents sold for $9, etc."If any gentleman disputes this, I have right here the sworn evidence, the bills reported to a committee of Congress in 1834, showing these facts in the face of all the honesty that is attributed to the War Department. I defy any man to show me that such robbery has ever been perpetrated on Indians in this country as was perpetrated, according to this report of 1834, by the War Department on the Indians of this country. It was robbery, sir; it was not fraud; it was open, palpable robbery." 4 Cong.Rec. (44th Cong. June 20, 1876) p. 3910.
 
 APPENDIX B
 Statement of Congressman Magninis:
 
 55
 "Every one in this House and in the country has been humiliated by the exposures made of abuses in this direction during the last few years. They have been painful and humiliating to us all. We have seen injustice done to individuals and the robbery of Indians permitted, whole tracts of country turned over to the domination of speculators and reservations extended over the public lands for private benefit. I say this regardless of the persons to whom these privileges have been granted. So long as these monopolies are to be granted it is no matter to me who enjoys the benefits. My opposition is not directed against individuals, but against the system under which these abuses are possible and under which these special privileges are granted.
 
 
 56
 "The history of American trade with the Indians is not a record that we can be peculiarly proud of. Fraud and avarice have nurtured passions not only between the red and white, but rival traders in time past have marshaled tribe against tribe and originated intertribal wars which have done far more to reduce the Indian to nothingness than all the encroachments and conflicts of the whites.
 
 
 57
 "When our non-intercourse law was adopted, it was intended not to rob but to protect the Indians. It was never intended to be a cover for fraud, nor designed to set up monopolies for the enrichment of traders against the interests of the Indians; but under its provisions, during the subsequent administrations of the Department, monopolies did grow up and strengthen themselves until they became the rule of Indian trade.
 
 
 58
 "In 1865 an effort was made, originated, I believe, by the gentleman from Iowa, [Mr. Kasson,] to cure these abuses, and an amendment was made to an appropriation bill, which is now the second section of the law in the Revised Statutes, which provided that thereafter all loyal citizens who were of good, moral character should be able to obtain upon application, without discrimination in favor of persons, license to trade with the Indians. That law has been evaded in a way which I will explain, and which evasion my amendment is intended to prevent in future. And certainly we ought to try in every way to prevent monopoly of trade on these Indian reservations. I submit that when an Indian is an industrious hunter, and by his industry in the chase and skill in woodcraft and trapping he secures a large quantity of robes, furs, and peltries, he should be allowed to sell them where he can get the most for the product of his toil, and also he should be allowed to purchase where he can get the most for his money.
 
 
 59
 "What would be thought if the Government were to establish such a system of trade in all our villages and give to one or more traders the right to establish the prices at which goods should be sold and the rates which the working-man should receive for the product of his labor? How long would the people of this country stand it? Why should not the Indians have the benefit of that competition which everywhere is the best regulator of prices?
 
 
 60
 "And graver evils have resulted from this system. Under its cloak the corrupt rings have been formed, and the chief abuses of the Indian service have occurred behind its convenient cover. It has enabled the corrupt agent to keep every one off the reservation except his confidants and accomplices; and thus under an almost impenetrable cover, and beyond the reach of detection, much of that unholy work has been done which has brought such odium upon the Indian service. It is to this system I object, and the amendment is intended to break up." 4 Cong.Rec. (44th Cong. June 6, 1876) p. 3639.
 
 
 
 *
 Honorable Warren J. Ferguson, United States District Judge, Central District of California, sitting by designation