**EAST OAKLAND–FRUITVALE PLAN-NING COUNCIL, a nonprofit California corporation, Plaintiff-Appellant,**

v.

**Donald RUMSFELD, Director, Office of Economic Opportunity, Defendant-Appellee.**

No. 25964.

United States Court of Appeals, Ninth Circuit.

Dec. 8, 1972.

Denis Clifford (argued), Lawrence Baskin, Stephen Ronfeldt, Ronald J. Watts, Thomas L. Fike, Oakland, Cal., for plaintiff-appellant.

Alan S. Rosenthal, Atty. (argued), Robert V. Zenner, Atty., William D. Ruckelshaus, Asst. Atty. Gen., Washington, D. C., James L. Browning, Jr., U. S. Atty., San Francisco, Cal., for defendant-appellee.

Before HAMLEY, BROWNING and WRIGHT, Circuit Judges.

BROWNING, Circuit Judge:

East Oakland-Fruitvale Planning Council sued the Director of the Office of Economic Opportunity for declaratory judgment and injunctive relief. The district court dismissed the action on the ground that the complaint failed to state a claim upon which relief could be granted. East Oakland-Fruitvale Planning Council v. Rumsfeld, 310 F.Supp. 546 (N.D.Calif.1970).[1] We vacate the judgment and remand.

I

The factual allegations of the complaint, to be accepted as true for the purposes of the motion to dismiss, are as follows:

The Council is a nonprofit corporation. It received a grant from OEO under section 232 of the Economic Opportunity Act, 42 U.S.C. § 2825, to conduct a research and pilot program in "advocacy planning." The goal of the program was to organize community groups in the East Oakland and Fruitvale areas of the City of Oakland, California, into a

---

1. By an earlier order, the district court denied the Council's motion for preliminary injunction on the ground that the Council had not "made a sufficient showing of irreparable injury." The Council has not challenged this conclusion on appeal.

"single policy-making and priority setting body which directs its attention to the multiplicity of problems and concerns of that community."

The Council operated successfully during its first year. Evaluations of its program by independent evaluators pursuant to section 233 of the Act, 42 U.S. C. § 2826, were favorable, and established that the program "was fully consistent with the provisions and in furtherance of the purposes" of the Act.

The Council applied to OEO for a grant of funds for a second year. The application was approved by the Director of OEO. It was then submitted to the Governor of the State of California pursuant to section 242 of the Act, 42 U.S.C. § 2834.[2] The Governor disapproved the grant. The Council entered into negotiations with representatives of the Governor's office to determine whether the Governor's objections could be satisfied. The Council "learned that the Governor's basis of disapproval was 'philosophical objections' to the very nature of [the Council's] program, i. e., advocacy planning for dealing with problems and concerns of the East Oakland-Fruitvale community." Ultimately negotiations were terminated by the Governor's representatives; the Governor's disapproval was not withdrawn.

The Director's representative at the negotiations reported to the Director, and recommended that he exercise his power under section 242 of the Act to override the Governor's disapproval.

The Council asked the Director to hold a hearing on the matter of his reconsideration of the Council's program in light of the Governor's disapproval, to specify the issues presented, and to give the Council an opportunity to participate. These requests were denied.

Without conducting a hearing and without making a finding as to whether the Council's program was consistent with the provisions and in furtherance of the purposes of the Economic Opportunity Act, the Director informed the Council that he would not override the Governor's disapproval.

As the legal basis of its claim, the Council alleges that section 242 of the Act, 42 U.S.C. § 2834, requires the Director to reconsider a vetoed grant and either make a finding that it is *not* "fully consistent with the provisions and in furtherance of the purposes" of the Act, or override the Governor's disapproval. The Council contends that its program *is* "fully consistent with the provisions and in furtherance of the purposes" of the Act, and that it has been informed by the Director that its program conforms in all respects to the Director's overall plan established pursuant to section 232(b) of the Act, 42 U.S.C. § 2825(b). The Council concludes that the Director's failure to make a favorable finding and override the Governor's disapproval is arbitrary and unlawful. It also concludes that the Director's denial of a hearing, specification of issues, and opportunity to participate is arbitrary and unlawful.

A declaratory judgment and injunctive relief are sought.

## II

The Director moved to dismiss the complaint on the grounds, among others, that "Congress has vested in [him] unreviewable discretion with respect to whether or not to reconsider a Gover-

---

2. 42 U.S.C. § 2834 (1970 ed.) provides:

In carrying out the provisions of this subchapter, no contract, agreement, grant, loan, or other assistance shall be made with, or provided to, any State or local public agency or any private institution or organization for the purpose of carrying out any program, project, or other activity within a State unless a plan setting forth such proposed contract, agreement, grant, loan, or other assistance has been submitted to the Governor of the State, and such plan has not been disapproved by the Governor within thirty days of such submission, or, if so disapproved, has been reconsidered by the Director and found by him to be fully consistent with the provisions and in furtherance of the purposes of this subchapter.

nor's disapproval and, where he does reconsider the disapproval, unreviewable discretion as to refusing to override the disapproval."

The district court assumed that the Director had failed to take any action at all following the Governor's disapproval, and that the complaint therefore presented the first and most extreme issue. 310 F.Supp. at 547.[3] Agreeing with the Director, the district court held that he need do nothing at all once the Governor exercised his veto—that he had unreviewable discretion to decide whether he would or would not consider overriding the Governor's disapproval. 310 F.Supp. at 549.

Whether the Director has such discretion is a question for the courts to decide. The statute does not bar judicial review, and there is no reason to suppose that Congress intended resolution of this threshold question of statutory construction to be "committed to agency discretion." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Courts are as expert as administrators in matters of statutory construction. See Barlow v. Collins, 397 U. S. 159, 166, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). We see no reason to decline to decide whether this statute imposes a duty upon the Director to re-examine any program vetoed by a governor, even if it would not be proper for a court to review a decision made by the Director in the discharge of such a duty. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 268, 74 S.Ct. 499, 98 L.Ed. 681 (1954); Rockbridge v. Lincoln, 449 F.2d 567, 571 (9th Cir. 1971). The question is one of law—the daily grist of the judicial mill. We turn to the merits.

The Director concedes that before he may *override* a governor's veto of a pro-

posed grant, he "must review that grant in light of the veto, and must give careful consideration to his understanding of the reasons for it." He argues, however, that he may choose to *accept* a governor's veto without giving the proposed grant any further consideration whatever.

The language of section 242 of the Act is essentially neutral. *See* note 2. It would permit the Director's interpretation, but does not require it. The interpretation given the language by the Director in administering the statute would be entitled to great weight, but it has never been explicitly stated and the acts from which it might be inferred are few and ambiguous.

The legislative history of the statute, however, strongly suggests that Congress intended the Director to reconsider every vetoed grant for a community action program in light of the provisions and purposes of the Act before deciding whether or not to override.

The Economic Opportunity Act of 1964 gave state governors the absolute right to bar grants for community action programs within their states; there was no provision that the Director might review and override a governor's veto. *See* section 209(c), P.L. 88–452, 78 Stat. 508. When Congress was asked to extend the Act in 1965, strong objections were raised to the governors' absolute power to veto grants for community action programs. To meet these objections, the power of the Director to reconsider a vetoed grant and override a governor's disapproval was added to the statute.

The objections to the governor's absolute power to veto grants for community action programs are summarized in the report of the Committee on Education and Labor of the House of Representa-

---

3. Appellant's counsel indicated to the trial court that this was the issue. In the course of the hearing below, the court said to appellant's counsel, "I think I understand that argument, and that's a pretty telling argument, that he has done nothing.

he's just let the Governor's veto lie there, so that it stops the program, and he doesn't do anything . . . . That's your point, as I understand it." Appellant's counsel replied: "Yes, it is" (Tr. at 25).

tives proposing the addition of the Director's override provision. *See* H.R. Rep.No. 428, 89th Cong., 1st Sess. 12–14 (1965), quoted in Sen.Rep.No. 582, 89th Cong., 1st Sess. 11–13 (1965). They fall into three broad categories. First, community action programs are local programs planned and developed by local agencies, and the absolute veto gave the governor, a state official, a power over local affairs that he did not have under state law. A veto at the state level was also considered to be inconsistent with the theory of the Economic Opportunity Act that local agencies could best manage programs designed to end local poverty. Second, the unreviewable veto lacked any parallel in state executive-legislative relationships under the constitution of any state, or in any federal legislation directly benefiting local communities. Finally, since no criteria were established for the exercise of the veto by the governors, and since the exercise of the veto was not reviewable, the governors' power was unfettered—it could be exercised for any reason or for no reason, arbitrarily, coercively, and in such a way as to defeat the policy and purposes of the Act. And such abuses, in the opinion of some congressmen, had in fact occurred.[4]

To meet these objections, Congress, while retaining the governors' right to disapprove community action grants within their respective states, shifted the ultimate power to allow or disallow such grants from the governors to the Director, and provided as a statutory standard for its exercise that the grant be consistent with the provisions and in furtherance of the purposes of the Act.

This statutory change would not accomplish its purpose if the Director were free to exercise the transferred power or not as he saw fit. Whenever the Director failed to perform his function of review, a governor would possess, in fact, the power Congress intended to deny him; and the means Congress adopted to assure that the ultimate power to disapprove community action programs would be exercised in accordance with the statutory standard, and not arbitrarily, coercively, or to defeat the policy and purposes of the Act, would be thwarted.[5]

Consistent with this view, the House Report uses mandatory language in de-

---

4. *See also* Sen.Rep.No. 582, 89th Cong., 1st Sess. 11–13 (1965). The same objections run through the floor discussion in both Houses. *See, e. g.,* 111 Cong.Rec. 17626–27, 17923–24, 17927–29, 20558, 20655, 20660–62, 20667, 20881–82, 25128.

5. *Compare* this court's recent decision in Rockbridge v. Lincoln, 449 F.2d 567 (9th Cir. 1971). The plaintiffs in that case sought to compel the Commissioner of Indian Affairs to adopt and enforce rules and regulations governing traders doing business on the Navajo Indian Reservation.

Two statutes were invoked. One provides that the Commissioner "shall have the sole power and authority" to appoint Indian traders and "to make such rules and regulations as he may deem just and proper" regarding the kind, quantity, and price of goods to be sold. 25 U.S.C. § 261. The second states that persons trading with the Indians on any reservation should do so "under such rules and regulations as the Commissioner of Indian Affairs may prescribe for the protection of said Indians." 25 U.S.C. § 262.

The Commissioner contended, and the district court held, that under these statutes whether to issue regulations, and what the regulations should provide, were matters committed to the Commissioner's discretion, and hence not reviewable under the Administrative Procedures Act.

Examining the legislative history, the court noted that much of the congressional debate related to abuses and injustices that had occurred because of unregulated monopolies in the Indian trading post system. The court concluded that Congress had authorized the Commissioner to issue regulations in order to end these abuses, and therefore intended that the Commissioner should exercise the authority given to him. Although the task of determining the specific content of the regulations was delegated to the Commissioner, the court held, "[t]his does not mean that the Commissioner has unbridled discretion to refuse to regulate, but rather that he shall exercise discretion in deciding what regulations to promulgate . . . ." 449 F.2d at 571.

scribing the Director's exercise of his added authority: "In those rare cases where a Governor disapproves a program or project, it must be reviewed and reconsidered by the Director of the Office of Economic Opportunity in the light of the comments by the Governor, if any." H.R.Rep.No. 428, 89th Cong., 1st Sess. 14 (1965). The sentence of the report that follows ("Where the Director finds reason, upon sound program grounds, for supporting a Governor's disapproval, the projects or programs will not go forward") reinforces the conclusion that the Director may not simply accept a governor's veto, but must review the grant and reach a reasoned decision, even though that decision is against overriding.

It is true that the next sentence of the report uses permissive language: "Where, however, after review of the facts the Director of the OEO makes the determination that the application is in fact fully consistent with the law, and with the purposes and policies of the act, these projects and programs may be permitted to go forward in spite of the Governor's disapproval" (emphasis added). A Conference Committee report contains similar language, stating that when a program is disapproved by a governor, "the Director could reconsider it, and if he found it fully consistent with the provisions and in furtherance of the purposes of this act, could override the Governor's disapproval." H.R. Rep.No. 1061, 89th Cong., 1st Sess. 10 (1965) (emphasis added). The latter language led the district court to conclude that the Director is free to accept a governor's veto without further consideration. 310 F.Supp. at 549.

It must be remembered, however, that under the 1964 Act the governor's veto power had been absolute: the Director could not review a vetoed program, the veto could not be overridden, the vetoed program could not go forward. The quoted language simply points out that under the amended statute these things now *could* occur, where before they could not.

■ Accordingly, we reject the Director's view that a governor is free to veto a community action grant for any reason or for no reason at all, and that the Director is free to make an equally standardless decision to allow a governor's veto to stand. We conclude that, under the amended statute, whenever a governor disapproves a community action grant, the Director is required to undertake an independent review of the grant against the statutory standard.

The contrary holding of the district court does not require reversal, however. In this court the Council no longer contends that the Director failed to reconsider the grant in light of the Governor's veto. The Council now asserts only that the Director erred in his decision not to override the veto.[6]

We therefore turn to the second ground upon which the Director moved to dismiss; that is, that he had "unreviewable discretion as to refusing to override the disapproval."

### III

■ This ground of the Director's motion invokes the provision of the Administrative Procedures Act excluding agency action from judicial review "to the extent that" the agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This "very narrow" exception to the general rule of reviewability is "applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" Citizens to

---

6. In its opening brief on appeal, the Council states: "The Director can abuse his discretion in one of two ways: First, if he fails to make any review at all. Secondly, where there is no rational nexus between the information provided the administrator and his ultimate decision. It is the latter type of arbitrary action that the Director committed here." *Compare* note 3.

Preserve Overton Park, Inc. v. Volpe, *supra*, 401 U.S. at 410, 91 S.Ct. at 821.[7]

Section 242 of the Economic Opportunity Act provides that the Director shall consider whether the vetoed program is "fully consistent with the provisions and in furtherance of the purposes" of the Act. *See* note 2.

This standard is hardly confining. On its face it would appear to leave a large area for the exercise of the Director's judgment in allocating the agency's resources.

■ When the Director establishes an overall plan for community action demonstration programs, as required by section 232(b) of the Act, and when he makes his initial selection of specific projects to implement this overall plan, he must act in a manner consistent with the provisions and in furtherance of the purposes of the Act. Yet the Council concedes that in performing these functions the Director exercises a discretion that is so wide as to be unreviewable.

The Council's argument must be that, as applied to the reconsideration of a vetoed program under section 242 of the Act, this generalized standard somehow takes on a definite and precise meaning that narrowly confines the discretion of the Director.

■ The legislative history is to the contrary. Congress did not intend, as the Council seems to imply, that the Director was to be confined to a re-examination of the correctness of his initial decision to fund the vetoed project, on the basis of the information then available to him. Congress intended that a governor should be free to raise a wide range of objections to specific community action programs, based on such "knowledge, information, and insights on the wisdom or desirability of particular projects" as the governor might possess. H.R.Rep.No. 428, 89th Cong., 1st Sess. 14 (1965).[8] And the Director, in turn, was expected to give consideration to the governor's views.[9]

7. The Director's contention that, under Ferry v. Udall, 336 F.2d 706 (9th Cir. 1964), review is barred whenever a statutory authorization is "permissive" rather than "mandatory" misstates the law. Barlow v. Collins, 397 U.S. 159, 165–166, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Rockbridge v. Lincoln, 449 F.2d 567, 570 (9th Cir. 1971); Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093, 1098 (1970); Wong Wing Hang v. I. & N. S., 360 F.2d 715 (2d Cir. 1966). *See also* Mulloy v. United States, 398 U.S. 410, 415, 90 S.Ct. 1766, 26 L.Ed.2d 362 (1970). The "permissive" character of the statutory authorization is one factor to be considered in determining whether Congress intended to preclude judicial review, but "[t]he question is whether nonreviewability can fairly be inferred from the over-all statutory scheme." Rockbridge v. Lincoln, *supra*, 449 F.2d at 570.

8. H.R.Rep.No.428 states that the provision establishing the governors' power to veto and the Director's power to override . . . is an apt compromise. It permits the legitimate exercise of power by the Governor with respect to programs going on within his State. It recognizes that Governors may have knowledge, information, and insights on the wisdom or desirability of particular projects. It recognizes that they should be in a position to address themselves to any problems those projects may raise under State law. It recognizes that Governors are especially competent to speak for the State as a whole so far as related State plans and programs are concerned. And it provides a method by which all of the knowledge, competence, and prestige a Governor may have can be effectively brought to bear.

9. It is clear that a governor was expected to bring his objections to the attention of the Director, and that the Director's review was to be "in the light of the comments by the governor, if any." H.R.Rep.No.428, 89th Cong., 1st Sess. 14 (1965). The congressional debates likewise reflect a general understanding that, through exercise of the veto, an exchange of views would occur between the Director and the governor. *See, e. g.,* 111 Cong.Rec. 20655 (1965) (remarks of Senator Javits). In addition, the final Conference report states that it was expected that regulations issued by the Director under § 242 would "include provision for informal hearings held by the Director at the request of the Governor of a State or other interested parties." H.R.Rep.No.1061, 89th Cong., 1st Sess. 10 (1965).

Thus, the standard to be applied by the Director in determining whether to override a governor's veto requires an evaluation of the "wisdom or desirability" of the particular project as a means to further the purposes of the Act, in light of knowledge, information, and insights contributed by the governor. This standard is extremely general; its application requires the exercise of the Director's expert knowledge regarding the practicality and efficacy of experimental projects. Its generality and breadth are such that it would not afford a reviewing court a practicable rule for determining the legality of the Director's ultimate decision to override or not to override. That decision is therefore not subject to judicial review.

It does not follow, however, that no aspect of the Director's action can be reviewed. Agency action is made unreviewable by 5 U.S.C. § 701(a)(2) only "to the extent" that it is committed to agency discretion. "Even under the committed-to-agency-discretion doctrine, partial review may be available for separable issues, as to which discretion or

expertise is insignificant." Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv.L.Rev. 367, 372 (1968). "When, after considering the relevant factors and balancing the institutional and individual interests, a court initially decides that an agency action is not reviewable *in toto*, it should next inquire whether partial review is possible if limited to separable issues so structured that the balance between institutional and individual interests is more favorable to review. A factor which prevents overall review may not bar review of particular issues." *Id.* at 395. *See also* Davis, Administrative Law (1970 Supp.) § 28.16 pp. 977–78.

An "all or nothing" approach to reviewability would, in specific cases, either be unfair to persons aggrieved by agency action, or impose an unwise burden upon the agency or the courts. Accordingly, separable issues appropriate for judicial determination are to be reviewed, though other aspects of the agency action may be committed to the agency's expertise and discretion.[10]

---

10. Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859, 874–875 (1970) (whether the Federal Aviation Administration violated its own regulations in awarding a government contract for instrument landing systems); National Helium Corp. v. Morton, 455 F.2d 650, 654 (10th Cir. 1971) (whether the Secretary of Interior complied with the National Environmental Protection Act, 42 U.S.C. § 4321 et seq., in terminating a government contract for the purchase of helium); Parker v. United States, 448 F.2d 793, 796–797 (10th Cir. 1971) (whether the Secretary of Agriculture violated § 3(b) of the Wilderness Act, 16 U.S.C. § 1132(b), before contracting for the sale and harvesting of certain timber from public lands, by failing to include these lands in studies and reports relating to recommendations to be made by the Secretary to the President).

The decision in Rockbridge v. Lincoln, *supra*, 449 F.2d 567, discussed earlier in another connection (*see, note* 5), is particularly pertinent to the problem of reviewability of separate issues where the agency's ultimate determination involves a large element of expertise and discretion.

Although the court recognized that the pertinent statutes, 25 U.S.C. §§ 261 and 262, invested the Commissioner of Indian Affairs with discretion to determine the specific content of regulations governing trading on Indian reservations, the court nonetheless held that the court could review the separable questions (1) whether the Commissioner had discretion to refuse to issue any regulations at all, and (2) whether the regulations issued satisfied the statutory requirement that they be "for the protection of said Indians." The court said:

In sum, the legislative history does not support the contention that the regulations promised under §§ 261, 262 are wholly within the discretion of the Commissioner and thus immune from judicial review. The history demonstrates that the statutes in question were passed with a specific set of legislative objectives in mind and that the lawfulness of the Commissioner's exercise of discretion—his decisions to regulate or not to regulate in any particular instance, as well as the particular mode of regulation chosen—is to be determined by reference to these objectives. [449 F.2d at 572.]

█ If a statute or regulation establishes a rule governing the conduct of the agency with respect to an aspect of the agency action, a court may determine whether the agency has complied with that rule, although the court still may not review other aspects of the agency action as to which there are no reasonably fixed rules to apply. The presence of a judicially enforceable rule both justifies judicial review, and limits its scope.

█ In the present case, the Director's ultimate decision is not reviewable because the standard governing that decision includes elements of such breadth and vagueness that they are legally unenforceable. However, the statute imposes a number of limitations upon the scope of the Director's discretion and the manner in which it is to be exercised that may be effectively enforced through judicial review without undue interference with the administrative process.

█ For example, as we have already ruled, the courts may hold the Director to his statutory obligation to reconsider a vetoed program even though the merits of the Director's decision upon reconsideration are unreviewable. Similarly, the Council's claim of entitlement to a specification of issues, a hearing, and formal findings in conjunction with the Director's reconsideration raises procedural issues that are clear, specific, and separable from the merits and that are therefore judicially determinable.[11]

█ Finally, we think the statute and its legislative history reveal a clear and specific limitation upon the scope of the Director's discretion that may be judicially enforceable even though it may require limited inquiry into the substance of the Director's decision-making.

█ The legislative history of section 242 indicates that Congress intended to confine the Director's review of a vetoed program to a consideration of the merits of the specific program as a means of advancing the purposes and policies of the Act, and to exclude other considerations.

Congress provided the override power in part "to prevent Governors from using their veto power over antipoverty projects in such a way as to defeat the policy and purpose of the act." H.R. Rep.No. 428, 89th Cong., 1st Sess. 14 (1965). The Director *may* sustain a governor's veto "[w]here the Director finds reason, *upon sound program grounds*, for supporting a Governor's disapproval." *Id.* (emphasis added). Proponents in both Houses expressed the view that the override provision guaranteed that a project would be disapproved only on the basis of considerations relating to the wisdom and efficacy of the project in light of the purposes of the Act.[12]

█ In view of this legislative history, the Director could not, as he suggests, sustain a governor's veto on a ground wholly unrelated to the merits of the vetoed project—for example, in ex-

---

11. Moore-McCormack Lines, Inc. v. United States, 413 F.2d 568, 581, 188 Ct.Cl. 644 (1969), and authorities cited; National Helium Corp. v. Morton, 455 F.2d 650, 654 (10th Cir. 1971) ; *see* Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv.L.Rev. 367, 372 (1968).

12. Congressman Roosevelt stated that the language of the override provision made sure "that the veto must be within the concept of the bill and the rightness of the project." 111 Cong.Rec. 17923 (1965). Senator Javits emphasized that the Director would be expected to override or not

depending upon his convictions "about the program." 111 Cong.Rec. 20655 (1965). Senator Yarborough, a member of the Conference Committee, said, "[T]he bill as finally agreed upon effectively curtails the power of Governors to frustrate the purposes of the war on poverty. . . . If [a Governor] vetoes a project, the Director of the Office of Economic Opportunity will reconsider the application, and if he finds it to be consistent with the provisions and in furtherance of the purposes of the war on property, he shall override the Governor's veto and the project will go forward." 111 Cong.Rev. 25127 (1965).

change for the governor's agreement to refrain from exercising his absolute veto over the establishment of Job Corps centers or the assignment of VISTA volunteers within the state concerned. *See* sections 115(c) and 810(b) of the Act, 42 U.S.C. §§ 2726(c) and 2992(b).

There is no apparent reason why a court could not, or should not, enforce such a clear and specific statutory limitation upon the scope of the Director's discretion without entrenching upon the broad area reserved by the statute to the Director's judgment and expertise.[13]

The Council has failed, however, to plead an infringement of this specific limitation upon the Director's discretion.

The nearest approach to such a charge is the Council's allegation that the Governor based his veto on " 'philosophical objections' to the very nature of the Council's program, i. e., advocacy planning for dealing with the problems and concerns of the East Oakland-Fruitvale community."

This is not an allegation that the Governor based his objections, or that the Director based his decision not to override, upon considerations extraneous to the Council's program.

 Perhaps it is the Council's position that the Governor cannot challenge the Director's choice of a *type* of program. We find nothing in the statute's language or legislative history to support such a limitation. The Director may choose among broad approaches to the problem of organizing the poor, as well as among specific projects. Neither the language nor legislative history of the statute suggests a rule that the Governor may not base his veto upon objection to the "philosophy" underlying a project, or that the Director may not weigh such a consideration in deciding whether to override. Such objections may have an important bearing upon the "wisdom or desirability" of a project, particularly if the project is an experimental one, involving a high potential for disruption and dispute within a community.

 The Council's general allegation that the Director acted arbitrarily, capriciously, and contrary to law adds nothing to the complaint. Schilling v. Rogers, 363 U.S. 666, 676, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960).

### IV

Although the Council's allegations of procedural deficiencies pleads a reviewable issue, it has no merit.

There is no requirement in the statute that a hearing be held or that other procedural safeguards be afforded. The Senate defeated a proposal that a gover-

---

13. Policy reasons for not reviewing the merits of an agency's discretionary decision (*see* Hi-Ridge Lumber Co. v. United States, 443 F.2d 452, 454–455 (9th Cir. 1971), Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv.L.Rev. 367 (1968)) do not apply to review of such a specific limitation upon agency discretion.

The element of discretion itself is absent, since the Director is absolutely barred from considering factors unrelated to the merits of the vetoed program.

The standard of review of the separable issue is easily applied. In most instances it would be sufficient to require the Director to state the reasons for his decision. The court could readily determine whether any of the factors upon which the Director relied were irrelevant to the merits of the project. Courts are experienced in deter-

mining relevance in a wide range of contexts. The technical agency expertise involved would be minimal.

Since the governor's veto is rarely exercised (15 times in the first three fiscal years of the program, *see* Sen.Rep.No.563, 90th Cong., 1st Sess. 8 (1967)), the number of cases likely to be brought to court, and the consequent drain on judicial resources, would be small. These few appeals would not appreciably hinder the overall administration of the poverty program.

There is no administrative review of the Director's decision, and hence no review at all if judicial review is denied.

In sum, the burden imposed upon the Director and the courts by judicial review of the separable issue would be slight, and the rejected applicant's need for review is great.

nor must be given a hearing before the Director decided whether to override his veto. 111 Cong.Rec. 20666, 20670 (1965). Later the Senate adopted a version of the present Act that eliminated the veto entirely but did provide for an informal public hearing at which the governor might state his objections to a program. 111 Cong.Rec. 21134–21137 (1965). The Conference Committee accepted this provision, with the minor change that the hearing need not be public. The House, however, rejected the Conference report, insisting upon the present version of the Act. 111 Cong.Rec. 23936–23937 (1965). The final Conference report contains a statement that the conferees "expect" the Director to issue regulations providing for "informal hearings" (*see* note 9), but the express rejection of a provision requiring a hearing precludes a holding that such an obligation may be implied.

▉ Of course, formal findings by the Director reflecting his reasons for overriding or sustaining a veto would be helpful, but the statute itself imposes no obligation upon the Director to make such findings; and if a court is to require findings, or a less formal explanation of the basis for the Director's decision, as an aid to review (*see* Citizens to Preserve Overton Park, Inc. v. Volpe, *supra*, 401 U.S. at 420–421, 91 S.Ct. 814, 28 L.Ed.2d 136), it must be in a case in which a reviewable issue is presented.

### V

The parties and the trial court acted without the benefit of the Supreme Court's decision in Citizens to Preserve Overton Park, Inc. v. Volpe, *supra*, and upon assumptions as to the scope of the Director's discretion under section 242 that are contrary to our interpretation of the statute. We therefore vacate the judgment and remand to the district court to permit the Council to amend its complaint, if it desires to do so, and for such further proceedings, if any, as may then be appropriate.