**HAYES INTERNATIONAL CORPORATION,**
Plaintiff-Appellant,

v.

**Dr. John L. McLUCAS, Secretary of the Air Force, Defendant-Appellee,**

**The Boeing Company,**
Intervenor-Appellee.

No. 73–2765.

United States Court of Appeals,
Fifth Circuit.

March 6, 1975.

Joseph F. Johnston, Drayton Nabers, Jr., Birmingham, Ala., Gilbert A. Cuneo, Robert L. Ackerly, Harvey G. Sherzer, Washington, D. C., for plaintiff-appellant.

Wayman G. Sherrer, U. S. Atty., Charles Stewart, Asst. U. S. Atty., Birmingham, Ala., Patrick Gray, III, Harland F. Leathers, Jeffrey Axelrad, Walter H. Fleischer, David M. Cohen, U. S. Dept. of Justice, Washington, D. C., for Sec. of the Air Force.

Thomas W. Christian, Birmingham, Ala., David E. Wagoner, Seattle, Wash., for Boeing.

Before TUTTLE, COLEMAN and AINSWORTH, Circuit Judges.

TUTTLE, Circuit Judge:

This case involves a suit by an unsuccessful bidder for a Government contract to have the contract awarded to a competitor set aside as being in violation of the regulations of the Department of Defense governing conflicts of interest in Federal procurement, § 1–113.2 and Appendix G of the Armed Services Procurement Regulations (ASPR), 32 C.F.R. § 1–113.2 and Part 141 (1971).[1] The suc-

---

1. 32 C.F.R. § 1–113.2 (1971) Organizational Conflicts of Interest provides that:

"(a) Appendix G—Rules for the Avoidance of Organizational Conflicts of Interest sets out some of the more essential policy considerations of the Department of Defense with respect to relationships with nonfederal institutions. Specifically, Appendix G describes examples of various organizational conflicts of interest which might come into being, and rules for avoidance of such conflicts: and it provides that action must be taken to avoid placing a contractor in a position where his judgment

cessful bidder, the Boeing Company, joined the suit as defendant-intervenor.

The district court originally issued a preliminary injunction enjoining the Secretary of the Air Force from taking any action pursuant to the contract awarded to Boeing; this Court on October 14, 1971, issued an order without opinion granting the Secretary of the Air

might be biased or where he would have an unfair competitive advantage within the scope and intent of the rules. However, the Appendix cannot of itself impose any obligations on the contractor: such obligations must be imposed by a contract clause designed to carry out the intent of the Appendix. Furthermore, potential contractors must be advised in the solicitation as to the extent of applicability of the rules, and must be given an opportunity to negotiate on the terms of the clause and its application.
(b)(1) The contracting officer is responsible for applying the rules in the Appendix to contracts under his cognizance and shall determine whether such proposed procurement is subject to the Appendix. . . . ”

The general provisions of 32 C.F.R. § 1–113.2 further provide for procedures by which the contracting officer may determine whether a potential conflict of interest exists, and the method by which he is to deal with that potential conflict. It concludes:

"(c) The contracting officer shall not impose restrictions under the Appendix in follow-on procurements on any prospective contractor in the absence of a specific contractual agreement with that contractor."

Appendix G of the Armed Services Procurement Regulations states four rules for the avoidance of organizational conflicts of interest. In the Preamble to those rules the regulation states "[w]here the Department of Defense does contract for research and development work, as it must for the bulk of that work, its choice of a contractor should be based primarily upon two considerations:
'(1) Getting the job done effectively and efficiently, with due regard to the long-term strength of the Nation's scientific and technical resources, and
(2) Avoiding assignments of work which would create inherent conflicts of interest.' "

Appendix G then sets out four specific rules on possible organizational conflicts of interest which state general prohibitions which are explained and illustrated by specific examples. The rules are said not to be meant to be viewed as all-inclusive.

"There will undoubtedly occur cases which are not resolved by these rules. As the Bell Report [Bureau of the Budget, Report to the President on Government Contracting for Research and Development, Sen.Doc.No. 94, 87 Cong., Second Sess. (1962)] said, '[Conflict of Interest] arises in several forms—not all of which are by any

means yet fully understood.' In order to assist in deciding what, if any, prohibition should be applied in such instances, the two basic principles of this code—(1) preventing conflicting roles which might bias a contractor's judgment, and (2) preventing unfair competitive advantage—should be paramount. The following rules and examples are not all-inclusive but merely attempt to achieve these two goals in a variety of situations. The ultimate test should always be: Is the contractor placed in a position where his judgment may be biased, or where he has an unfair competitive advantage? If so, corrective action must be taken in accordance with the rules below."

The first three of the rules apply specifically when a contractor agrees to provide Systems Engineering and Technical Director (SE/TD) for a system, without at the same time assuming overall contractual responsibility for its development. The terms "Systems Engineering" and "Technical Direction" are defined within the rule, and are said to be terms of art relating to military procurement. The last of the four rules applies to situations where a contractor obtains data in which a competitor has proprietary, rights, and the use of that proprietary data is accordingly limited.

Part 141 of 32 C.F.R. was deleted effective November 5, 1971. See 36 F.R. 21339 (1971). Despite this deletion, 32 C.F.R. § 113.2 continues to refer to Part 141 as containing the operative rules governing avoidance of organizational conflicts of interest. The text of former Part 141 of 32 C.F.R. remains as Appendix G of the Armed Services Procurement Regulations. At the request of this Court, counsel for all parties were invited to comment on the continued legal effect of Appendix G, following its deletion from the C.F.R. There is no doubt that both the sustaining engineering contracts awarded to Boeing, and the IRAN/Modification contract awarded to Boeing in 1971 were awarded prior to the deletion of Part 141 and hence the deletion would have no immediate effect on the subject matter of this suit. Both counsel for the plaintiff and the Government have submitted supplemental papers to this Court to the effect that the deletion of Part 141 was due to inadvertence, and that the Air Force has continued to view Appendix G as being of continued legal effect. Naturally this Court is not prepared to make findings of fact on this matter. We note that the deletion of Part 141 creates confusion as to the continued legal effect of the Rules for Avoidance of Organizational Conflicts of Interest.

Force's motion for a stay pending appeal. The plaintiff, Hayes International Corporation, then moved the district court to vacate the preliminary injunction and the matter proceeded to trial. Hayes stated that the reason it was requesting that its original preliminary injunction be vacated was that it was in the "best interest of all the parties that this case proceed as quickly as possible to a judgment on the merits" inasmuch as the challenged contract was then scheduled to extend for as long as five years.

The case was tried without a jury. The trial court found that Boeing did not enjoy an unfair competitive advantage over Hayes, nor was it guilty of a conflict of interest which might have biased its judgment and accordingly held that the contract was valid. The plaintiff brings this appeal. We affirm.

## I.

### FACTS

The facts of this case are largely undisputed. While the expert witnesses at trial differed as to their view of the applicability of the organizational conflict of interest regulations, and to the extent of Boeing's actual advantage over other bidders seeking the contract in question, the case largely involves the legal issue of the extent to which the Armed Services Procurement Regulations apply to the facts of this case.

In March, 1971, the Secretary of the Air Force, acting through the United States Department of the Air Force, Air Force Logistics Command, Headquarters Oklahoma City Air Materiel Area, Tinker Air Force Base, issued "Requests for Proposals" for the procurement of services to perform the "inspection and repair as necessary" (IRAN), modifications and other related work on the worldwide Air Force Fleet of KC–135 Aerial

Refueling Tankers. The Requests were issued pursuant to the authority delegated to the Secretary in 10 U.S.C. § 2304(a)(10)(1970). Pursuant to the Requests, on June 23, 1971, the Secretary awarded contract No. F34601–71–C–3366 to the Boeing Company, to take effect on July 2, 1971. Hayes International, the plaintiff in this suit, was one of the two unsuccessful bidders for this contract.[2]

Contract 3366 was awarded to Boeing by the Air Force in the amount of $12,-294,894.16 for the first year of performance. The contract was designated to extend over a five-year period for substantially similar maintenance and repair work, based upon options available to the Government to make periodic work assignments. The five-year contract was thus valued at approximately $60,000,-000.

The KC–135 is an aircraft originally manufactured by Boeing, and is used by the Air Force as a tanker for supplying fuel in mid-air to other aircraft.[3] The IRAN/Modification contract, as contracts of this sort are referred to in the industry, provided for three classes of work to be performed. The successful bidder was first to perform periodic inspections of each aircraft. The proposal submitted by each of the bidders described the procedures the bidder would follow on each aircraft and offered a per unit price for this work. Secondly the bidder agreed to perform such modifications as prescribed by the Air Force. Modifications might be performed only on individual aircraft, as each suffered individual wear and fatigue following use, or as modifications might be prescribed for each aircraft in the KC–135 fleet. No estimate of total costs was possible because at the time the proposal was submitted it was not known how many aircraft would need modification,

---

**2.** McDonnell-Douglas Aircraft Corporation was the third bidder for IRAN/Modification contract 3366.

**3.** The 135 family of aircraft are the military equivalent of the Boeing 707 commercial aircraft. The KC designation describes a partic-

ular kind of 135 aircraft, and the IRAN/Modification contract in question applied only to that specific class of 135 aircraft. Other Boeing built 135 aircraft include: the C–135 cargo plane, the EC–135 electronics cargo plane, the RC–135 reconnaissance cargo plane, and the W–135 weather plane.

or precisely what modifications would be required. The third part of the work contracted for by the Air Force under contract 3366 was unscheduled maintenance at the time the IRAN work was being performed. Following the inspection of each aircraft there might be a variety of different types of repairs which needed to be performed. Each bid set out a formula by which payment could be estimated. This entails largely a designation of a set fee per man hour of work. Using this formula, the Air Force would be able to estimate the total costs of any particular repair on any given number of aircraft.

Hayes International had been awarded a similar contract for the forty months preceding the issuance of the Boeing contract, but lost the 1971 contract for

its bid was several million dollars higher than that submitted by Boeing.

For a number of years before contract 3366 was awarded Boeing had been under contract to the Air Force to supply sustaining engineering and related support services for the KC–135 fleet. Pursuant to these contracts Boeing had made specific recommendations as to what maintenance and modifications were required on the entire fleet of more than 700 KC–135 aircraft. Boeing continues to operate under these sustaining engineering and related support services contracts. These were awarded to Boeing on a "sole source" basis without competition or open bidding,[4] as was customary in awarding sustaining engineering contracts to the original manufacturer of a given aircraft.[5] The trial court found

---

**4.** 10 U.S.C. § 2304(a) provides for the letting of contracts following formal advertising for bids. The section also sets out a number of exceptions to this requirement of formally advertising for competitive bids, including where the contract is for property or services for which "it is impracticable to obtain competition," 10 U.S.C. § 2304(a)(10).

**5.** Defendant's Exhibit No. 2 introduced and received into evidence at trial shows the 74 IRAN/Modification contracts in effect during FY '72 and the first quarter of FY '73 which had been let by one of the five Air Materiel Areas. These IRAN/Modification contracts were for maintenance on many different types of aircraft. Of the 74 IRAN/Modification programs, 51 involved aircraft for which the original manufacturer had obtained engineering support contracts which the evidence showed were similar to the sustaining engineering and related support services contracts Boeing held for the KC–135. In 16 of the 74 IRAN/Modification programs, the original manufacturer had obtained the IRAN/Modification contract. Of these 16, 11 held or had held engineering service contracts. Five manufacturers who obtained IRAN/Modification contracts had not previously held engineering support contracts. Thus 40 IRAN/Modification contracts were awarded to a contractor other than the original manufacturer, despite the manufacturer's engineering services contracts.

During FY '72 and the first quarter of FY '73 Hayes International, the plaintiff in this suit, had successfully competed against the original manufacturer holding an engineering support contract for 3 IRAN/Modification

contracts—contracts for the C–130, the C–123 and the B–57 (during the first quarter of FY '73). Hayes International on five occasions during the period covered by Defendant's Exhibit 2 had competed for IRAN/Modification contracts where the original manufacturer did not hold sustaining engineering contracts.

The record shows that manufacturers routinely bid on IRAN/Modification contracts for aircraft which they had originally produced; experts in the field of Air Force procurement testified that they knew of no instance where a manufacturer had been prohibited from competing for an IRAN/Modification contract, and further testified that the Air Force routinely entered into engineering support service contracts with original manufacturers similar to that which Boeing held for the KC–135. Finally the record showed that a manufacturer could obtain substantially greater profit on performing IRAN/Modification contracts than it could performing sustaining engineering services.

Defendant's Exhibit No. 2 shows that original manufacturers routinely obtain engineering support service contracts. However, the 74 IRAN/Modification programs in effect during the five quarters included in the exhibit show that such engineering support service contracts do not provide such a competitive advantage in bidding for IRAN/Modification contracts that manufacturers with sustaining engineering contracts were able to obtain a significant number of IRAN/Modification contracts. Thus the relationship between prior engineering support service contracts and subsequent bidding on IRAN/Modification contracts is uncertain.

that Boeing's relationship under the sustaining engineering and related support services contracts was essentially as the "engineering arm" of the Air Force for the KC–135 fleet.

Among its findings of fact, the trial court found: (1) as the contractor responsible for sustaining engineering for the KC–135 fleet, Boeing proposed a number of different modifications and improvements in the KC–135 design; (2) Boeing as part of its duties under the sustaining engineering contracts conducted a series of tests, evaluating fatigue stress, and other factors which affect the durability and usefulness of each aircraft; and (3) Boeing was thus privy to technical data it generated as well as that provided by the Air Force. It was undisputed that Boeing was responsible for recommending to the Air Force what priority should be placed on any particular set of repairs.

The repairs and modifications which Boeing recommended to the Air Force comprised in part the work the IRAN/Modification contractor would perform. Boeing was thus in a position to recommend changes and modifications to aircraft which would enhance the value of the IRAN/Modification contract it subsequently was awarded.

Hayes argues as a consequence of Boeing's sustaining engineering contracts it violated those D.O.D. regulations outlawing organizational conflicts of interest—both because in its dual role as both technical advisor and IRAN/Modification

contractor Boeing was in a position to recommend work which it eventually performed, thereby raising the possibility of unneeded repairs being recommended to increase its own profits, and in addition because Boeing's competitive position was superior to all others bidding for the IRAN/Modification contract. This latter facet of its alleged violation of D.O.D. procurement regulations was due to Boeing's acknowledged superior opportunity to obtain and assess information—thereby enabling it to know with greater assurance what types of modifications and repairs would be performed under the IRAN/Modification contract. Because it alone knew what modifications could be expected, something which no other competitor knew with equal certainty,[6] Hayes alleges Boeing could submit a lower bid for work all bidders knew was to be performed, and recoup its profits on the additional work assignments it alone knew would be forthcoming.

At trial Hayes proved that Boeing recommended three specific sets of modifications which had the effect of greatly increasing the value of the IRAN/Modification contract it obtained, information which neither of its competitors possessed at the time of bidding. These three sets of repairs involved alterations to the aerial boom,[7] and two sets of wing modifications. One of the wing modifications is actually being performed by Boeing under its IRAN/Modification contract, as is the aerial boom modification, but the most substantial repair,

---

**6.** Hayes International, as the IRAN/Modification contractor from 1968 to 1971, was aware generally of structural problems in the aerial boom and the wing for which Boeing recommended modifications. At trial it was shown that Hayes participated in meetings at which these problems were discussed, but Hayes did not receive the same information which Boeing used in recommending modifications and repairs, and the trial court found that Boeing had access to confidential and vital information its competitors lacked.

While the evidence showed that Boeing had access to information which enabled it to predict with far more certainty what modifications could be expected during the term of contract 3366, at the same time all

bidders knew that many modifications could be expected. During the 40 months during which Hayes had held an IRAN/Modification contract on the KC–135, over 153 modifications were added to the contract enormously increasing its value. This was not unusual, and the record shows that the initial predicted value of a contract was almost always smaller than the ultimate value the contract was to reach after many modifications were made to it.

**7.** The aerial boom is the nozzle by which fuel is transferred in mid-air from the KC–135 tanker to other aircraft. The alterations in it which Boeing performs under its IRAN/Modification contract have an estimated cost of $2,000,000.

Wing Fatigue Package V (which was valued as being in excess of $200,000,000) was awarded to Boeing subsequent to the filing of this litigation on a sole source basis.[8] Beyond these specific instances of advance knowledge of modifications to be performed, Hayes argues that Boeing's general responsibility for proposing modifications and repairs which were to be performed under the IRAN/Modification agreement constitutes the type of organizational conflict of interest which is barred by 32 C.F.R. § 1–113.2 and Part 141 (1971).

The district court found that while Boeing had access to vital information concerning the KC–135 fleet it also found that the Air Force evaluated all recommendations made by Boeing, and that Boeing was not in a position to make final decisions on its own recommendations for modifications and repairs. The district court further found that Boeing was only one source of ideas for improvement, although it did not specify what sources other than those within the Air Force itself affected work specifications and modifications for the KC–135.

The district court found that the Air Force has made a practice of awarding sustaining engineering services contracts substantially identical to those with Boeing with the manufacturers of several other aircraft in its inventory. Some of these manufacturers have subsequently competed for IRAN/Modification contracts on the aircraft they were supplying with sustaining engineering services—at times being successful, and at times unsuccessful in bidding for the modifications which they in part proposed. The court noted that Hayes itself had competed occasionally against the holder of a sustaining engineering contract—winning some IRAN/Modification contracts, and losing others. The court found that one such example was the C–130 Lockheed built aircraft, in which competition Hayes was successful; the court noted that subsequent to the granting of contract 3366, Hayes and Boeing also competed for work on the KC–135 A aircraft, where the contract was awarded ultimately to LTV Corporation.

The district court concluded that "Service Engineering Contracts with the Air Force do not result in the contractor being in a conflicting role which might bias its judgment nor do such contracts result in the contractor obtaining an unfair competitive advantage in bidding on future contracts for work on the aircraft involved." The court further found that the award of contract 3366 was "not contrary to public policy and the public interest in maintaining the integrity of the procurement system." The court made no specific finding as to the applicability of 32 C.F.R. § 1–113.2 and Part 141 to sustaining engineering contracts, but appears to have assumed if an actual conflict of interest was shown, or if it could be proven that Boeing enjoyed a superior competitive position due to its sustain-

8. The two sets of wing modifications were issued in the form of so-called "Wing Fatigue packages," both of which Boeing performed. Wing Fatigue Package IV was issued to Boeing under the IRAN/Modification contract 3366. Wing Fatigue Package V involved far more extensive changes in the wings of every KC–135 aircraft, and at a unit price of $313,-934.00 amounts to a total cost for a modification of the entire fleet of over $200,000,000. This modification was later issued to Boeing under a separate contract, No. F34601–72–C–4213–PZ0003, as opposed to being assigned to Boeing under its IRAN/Modification contract.

Hayes at oral argument and in what it styled a "Supplemental Statement" in effect expanded its requested relief to include an injunction against the continued operation of this second contract. The Government argues, in our view correctly, that the second requested injunction constituted a new issue raised on appeal, and that under cases such as Cliff Food Stores v. Kroger, Inc., 417 F.2d 203, 208 n. 3 (5th Cir. 1969); Poston v. Caraker, 378 F.2d 439 (5th Cir. 1967); Humble Oil & Refining Co. v. Martin, 298 F.2d 163 (5th Cir. 1961), such a new issue cannot be raised at this time on appeal. It is not necessary to specifically consider the problem vigorously argued by the parties in supplemental papers whether an injunction could properly issue against this second contract, however, inasmuch as we affirm the trial court's denial of the permanent injunction requested to enjoin enforcement of contract 3366.

ing engineering contract, the resulting contract might be voidable.

## II.

## STANDING

■ The district court found that Hayes had standing to challenge the award of contract 3366. We agree.

■ The Secretary of the Air Force is required to follow procedures and practices prescribed by Congress in making procurement contracts. Foremost among these statutes is the Armed Services Procurement Act, 10 U.S.C. §§ 2301–2314[9] and it was under the authority of this Act that the contract in question was let. Contract 3366 was awarded following "Requests for Proposals" which is a procurement procedure available to the Secretary under 10 U.S.C. § 2304(a)(10) by which he had authority to by-pass formal competitive bidding if it is impracticable to obtain competition.

Congressional limitations on discretionary awards of procurement contracts have been held to be enacted for the benefit of the public, not disappointed bidders, American Smelting & Refining Co. v. United States, 259 U.S. 75, 42 S.Ct. 420, 66 L.Ed. 833 (1922); United States v. New York & Porto Rico S. S. Co., 239 U.S. 88, 36 S.Ct. 41, 60 L.Ed. 161 (1915), and accordingly under the "legal interest" theory of standing, Tennessee Electric Power Co. v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939); Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938); Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), it was thought until recently that no litigable rights are conferred on unsuccessful bidders by the statutory standards. Thus they were thought to lack standing to seek to remedy even a blatant irregularity in the procurement procedures followed by a Government agency. The leading case for this view is Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940), and the Government urges us to follow it as controlling precedent.

■ While *Perkins* has not been expressly overruled by the Supreme Court,[10] the "legal interest" test for

---

9. *See also,* the Federal Property and Administrative Services Act, 41 U.S.C. §§ 251–260 (1970); Armed Services Procurement Regulations, 32 C.F.R. Parts 1–39 (1972); and Federal Procurement Regulations, 41 C.F.R. § 1–1.-000 et seq. (1972).

10. *See, however,* Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970) where the court notes several significant legislative enactments which arguably have the effect of legislatively overruling *Perkins.* Foremost is the passage in 1946 of the Administrative Procedure Act which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial relief thereof." The Supreme Court has held that this passage was meant to broaden the concept of standing in the area of judicial review of administrative actions, Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

Until *Scanwell* federal courts have, with few exceptions, followed the *Perkins* rationale that an unsuccessful bidder for a Government contract has no standing to complain. Edel-

man v. Federal Housing Administration, 382 F.2d 594 (2d Cir. 1967); United States v. Gray Line Water Tours of Charleston, 311 F.2d 779 (4th Cir. 1962); Friend v. Lee, 95 U.S.App. D.C. 224, 221 F.2d 96 (1965).

*Scanwell* has not been expressly rejected by any Courts of Appeals which have considered it, and two courts have expressly adopted its reasoning. Merriam v. Kunzig, 476 F.2d 1233 (3d Cir. 1973); William F. Wilke, Inc. v. Department of the Army, 485 F.2d 180 (4th Cir. 1973). This Court in Allen M. Campbell Co. v. Lloyd Wood Construction Co., 446 F.2d 261, 264 n. 5 (5th Cir. 1971) acknowledged that the question of standing for unsuccessful bidders was viewed as an open one, and this Court has subsequently referred approvingly to *Scanwell,* without adopting it. *See* Ray Baillie Trash Hauling, Inc. v. Kleppe, 477 F.2d 696, 704 n. 8 (5th Cir. 1973).

*See generally,* Pierson, Standing to Seek Judicial Review of Government Contracts: Its Origins, Rationale and Effect on the Procurement Process, 12 B.C.Ind. and Comm.L.Rev. 1 (1970); Comment, Government Contract Bid Protest: Judicial Review and the Role of the Court of Claims, 39 U.Chi.L.Rev. 814 (1972).

standing has largely been abandoned. *See* Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1967). While the Supreme Court has recognized that earlier cases did establish that standing would be denied "unless the right invaded is a legal right,—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege," Tennessee Electric Power Co. v. T.V.A., 306 U.S. at 137–38, 59 S.Ct. at 369, in Data Processing Service v. Camp, *supra,* the Court stated unambiguously that "the 'legal interest' test goes to the merits. The question of standing is different. It concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153, 90 S.Ct. at 830.

▮▮▮ Where, as here, the plaintiff cannot rely on any specific statute authorizing judicial review of administrative decision-making, the question of standing hinges on whether the party has alleged such a "personal stake in the outcome of the controversy," Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) as to guarantee that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." Flast v. Cohen, 392 U.S. at 101, 88 S.Ct. at 1953. As the Supreme Court noted in Sierra

Club v. Morton, "[w]here, however, Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff." 405 U.S. at 732, 92 S.Ct. at 1365. Recognizing that "[c]learly the momentum of recent Supreme Court decisions is in the direction of finding standing whenever 'the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise' and that 'the interest sought to be protected by the complainant is arguably within a zone of interests to be protected or regulated by the statute or constitutional guarantee in question,'" Allen Campbell Co. General Contractors, Inc. v. Lloyd Wood Construction Co., 446 F.2d 261, 264 n. 5 (5th Cir. 1971), we believe these are the two tests the plaintiff must meet in order to establish standing to sue.[11]

### A. *Injury in Fact.*

Unlike the type of delicate question which arises when a plaintiff alleges an injury of a non-economic nature to interests which are widely shared, *see, e.g.,* Sierra Club v. Morton, *supra*; United States v. Students Challenging Regulatory Procedures (S.C.R.A.P.), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), the economic injury suffered by a losing bidder in seeking a government procurement contract is manifest. No serious doubt exists that Hayes International suffered economic loss by virtue of its inability to obtain the contract at issue in this case.

11. A third requirement is sometimes added that "there must be no 'clear and convincing' indication of a legislative intent to withhold judicial review." Ballerina Pen Co. v. Kunzig, 140 U.S.App.D.C. 98, 433 F.2d 1204, 1207 (1970); *see also* Blackhawk Heating and Plumbing Co. v. Driver, 140 U.S.App.D.C. 31, 433 F.2d 1137 (1970); Constructores Civiles De Centro America, S.A. (CONCICA) v. Hannah, 148 U.S.App.D.C. 159, 459 F.2d 1183 (1972). As the D.C. Circuit recognized in

*Ballerina Pen, supra,* 433 F.2d at 1207 n. 6, this reviewability test for standing has also been treated as a separate and distinct issue, Data Processing Service, Inc. v. Camp, 397 U.S. at 156, 90 S.Ct. 827; Abbott Laboratories v. Gardner, 387 U.S. 136, 140; 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The distinction between the two methods of dealing with the question of the scope of judicial review is murky and we choose to treat the issues separately.

## B. *The Zone of Interest.*

Early cases which applied the "legal interest" test of standing also made the general finding that government procurement statutes were "not intended to be a bestowal of litigable rights upon those desirous of selling to the Government. . . ." Perkins v. Lukens Steel Co., 310 U.S. at 127, 60 S.Ct. at 877; American Smelting & Refining Co. v. United States, *supra*; Goldberg v. Daniels, 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191 (1913); Edelman v. Federal Housing Administration, 382 F.2d 594, 597 (2d Cir. 1967); United States v. Gray Line Water Tours of Charleston, 311 F.2d 779 (4th Cir. 1962). These authorities do not, however, directly answer the question whether the interests of a disappointed bidder fall within the zone of interests arguably protected by a statute or regulation, for even if the plaintiff is unable to assert a violation of a legal right which the court may remedy, "once review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate." Sierra Club v. Morton, 405 U.S. at 737, 92 S.Ct. at 1367. It was indeed largely on this premise that a disappointed bidder is uniquely suited to assert a public interest in the Government's compliance with relevant statutes regulating procurement that led the D.C. Circuit to hold a losing bidder has standing to contest an arguably illegal Government contract—despite the fact it may not necessarily be able to assert a "legal right" to the contract. Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970).

Here we believe the interests of competitors are at least arguably within the zone of interests protected by the Department of Defense regulations against organizational conflicts of interest. Those regulations, under which this suit was brought, 32 C.F.R. § 1–113.2 and Part 141 (1971), set out rules which are intended to achieve two different but reinterest which bias a contractor's judgment, and avoiding situations where one contractor has an unfair competitive advantage over another. It seems probable that this latter goal is at least in part designed to protect the interests of competitors who are unable to obtain government contracts due to the superior competitive position of the successful bidder, whose competitive advantage is the result of its prior confidential relationship with the Government.

References to the goal of avoiding unfair competitive advantages for a contractor in a privileged position with the Government frequently occur in the legislative reports and hearings preceding drafting of the organizational conflicts of interest procurement regulation. *See, e.g.,* Organization and Management of Missile Programs, H.R.Rep. No. 112, 86th Cong., 1st Sess., 88, 92, 95 (1959); House Comm. on Gov't Operations, Avoiding Conflicts of Interests in Defense Contracting and Employment, H.R.Rep. No. 917, 88th Cong., 1st. Sess., 4, 52 (1963). While these references draw no formal distinction between the Government's interest in free competition, and the interest of a competitor—these cited passages do express a broad concern that unfair competition may result, and the regulation subsequently drafted seems sufficiently broad to incorporate both the Government's interest in lower prices and higher quality through free competition, as well as the industry's interest in maximizing the opportunity for each competitor to bid on an equal footing.

## C. *Effect on Future Procurement.*

While the Government urges this Court to dismiss the suit on authority of Perkins v. Lukens Steel, *supra*, and thus affirm the requirement that a formal legal interest must be found before a party has standing to challenge the grant of a Government contract, the Government also proposed larger grounds for refusing to review procurement decisions

of the sort involved in this case.[12] These concerns are both serious and important, and we do not feel we can ignore them. While we ultimately deny the relief the plaintiff requests, we do *not* do so on the basis that Hayes lacks standing to raise the issues presented, and we recognize we may thus occasion other challenges to Government procurement which necessarily will have effects on the manner in which the Government conducts military procurement.

In its seminal opinion of Scanwell Laboratories, Inc. v. Shaffer, *supra,* the D.C. Circuit Court took note that there were justifiable concerns that judicial review of procurement decisions may have a disastrous effect on the efficient operation of Government procurement. In matters such as the one before us in this case, where the procurement decision touches on weapons systems which may have a vital impact on national defense, the courts must be wary of intruding into areas where they have neither special competence nor the ability to act expeditiously.[13] Despite these concerns, we feel we must follow the line of authority which began with *Scanwell.*

There is now a substantial body of case law in the D.C. Circuit which by now almost routinely applies *Scanwell* and grants judicial review of procurement decisions. *See e. g.,* P.A.M. News Corp. v. Hardin, 142 U.S.App.D.C. 227, 440 F.2d 255 (1971); National Automatic Laundry and Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 443 F.2d 689 (1971); Blackhawk Heating and Plumbing Co. v. Driver, 140 U.S.App.D.C. 31, 433 F.2d 1137 (1970); Ballerina Pen Co. v. Kunzig, 140 U.S.App.D.C. 98, 433 F.2d 1204 (1970), cert. denied 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971); M. Steinthal and Co. v. Seamans, 147 U.S. App.D.C. 221, 455 F.2d 1289 (1971); Wheelabrator Corp. v. Chafee, 147 U.S. App.D.C. 238, 455 F.2d 1306 (1971); Kentron Hawaii, Ltd. v. Warner, 156 U.S. App.D.C. 274, 480 F.2d 1166 (1973). As that Court observed in *M. Steinthal and Co., supra,* the administration of suits involving military procurement has not been without its problems—frivolous suits are occasionally filed, and not infrequently the delay occasioned by judicial review has a harmful effect on the smooth and efficient operation of military procurement. Procurement deci-

---

**12.** The Supreme Court in *Perkins* expressly referred to the possible effects on the procurement process as contributing to its holding that an unsuccessful bidder lacked standing to sue.

"Courts should not, where Congress has not done so, subject purchasing agencies . . . to the delays necessarily incident to judicial scrutiny at the instance of potential sellers . . .. A like restraint applied to purchasing by private business would be widely condemned as an intolerable business handicap. It is, as both Congress and the courts have always recognized, essential to the even and expeditious functioning of Government that the administration of the purchasing machinery be unhampered." 310 U.S. at 130, 60 S.Ct. at 878.

*See also,* Lind v. Staats, 289 F.Supp. 182, 186 (N.D.Cal.1968) for a strong statement of the possible harm resulting from interference with essential Government procurement. *See also* discussion in M. Steinthal and Co. v. Seamans, 147 U.S.App.D.C. 221, 455 F.2d 1289, 1300 (1971).

**13.** Our decision in Allen M. Campbell Co. v. Lloyd Wood Construction Co., 446 F.2d 261 (5th Cir. 1971) demonstrates the type of inefficiency which may be occasioned by judicial review of procurement decisions. In that case the district court originally entered an injunction restraining the Air Force from entering into a contract for the construction of housing when the plaintiff contended that the bidder to whom the contract was to be awarded was ineligible because it was not a "small business" within the meaning of the relevant statute. 318 F.Supp. 1167 (N.D.Ala. 1970). The Air Force, because it determined that the housing was urgently needed, complied with the injunction and awarded the contract to the plaintiff. On appeal, this Court determined that the Air Force's original determination was reasonable, and that the injunction had been erroneously granted. Subsequently, the Court of Claims ordered the Government to pay damages to the original successful bidder flowing from the Air Force's obedience to the district court's order. 467 F.2d 931, 199 Ct.Cl. 515 (1972). As a consequence of this litigation, the Government was in effect required to pay two different bidders for the same work.

sions are frequently complex and involve factual issues courts are ill-equipped to settle. Obviously many procurement decisions involve delicate questions of policy which are better left to the expertise of an executive agency to answer.

 At least in part the problem has been to develop proper standards in determining when a discretionary injunction should issue. Many different factors are necessarily taken into account in making a decision of this sort, and the experience in the D.C. Circuit has shown that the grant of an injunction which has the effect of delaying possibly vital procurement may have grave effects on the national interest. Among the various factors which have been expressly recognized as proper to take into account in determining whether an injunction should issue are: (1) the importance to national defense of the item to be procured;[14] (2) the availability of alternative remedies, either in the Court of Claims[15] or a bid protest claim to the General Accounting Office;[16] and (3) the substantial likelihood that statutory standards were in fact violated.[17] Further the plaintiff has been held to bear a heavy burden of proving that a procurement officer's decision was genuinely arbitrary and unreasonable.[18] We agree that there is a "strong public interest in avoiding disruptions in procurement, and

for withholding judicial interjection unless it clearly appears that the case calls for an assertion of an overriding public interest 'in having the agencies follow the regulations which control government contracting.' " *M. Steinthal and Co., supra*, 455 F.2d at 1300. At the same time, we do not believe that denying review altogether is the proper way to temper judicial discretion in granting injunctions which may have harmful effects on military and Government procurement.

### III.

### REVIEWABILITY

██ The Administrative Procedure Act, 5 U.S.C. § 701(a) provides that the provisions of the Act authorizing judicial review apply "except to the extent that —(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." The Supreme Court has held that there is virtually a presumption in favor of judicial review, Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) unless a contrary purpose is fairly discernible in the statutory scheme. Data Processing Service v. Camp, 397 U.S. 150, 157, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Agency action is normally found to be non-reviewable

14. Ray Baillie Trash Hauling, Inc. v. Kleppe, 477 F.2d 696 (5th Cir. 1973).

15. *M. Steinthal and Co., supra*, 455 F.2d at 1302. The damages available in the Court of Claims are normally limited to those costs associated with preparation of the losing bid. *See* Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (1970); Robert F. Simmons and Associates v. United States, 360 F.2d 962, 175 Ct.Cl. 510 (1966); Heyer Products Co. v. United States, 140 F.Supp. 409, 135 Ct.Cl. 63 (1956) and 177 F.Supp. 251, 147 Ct.Cl. 256 (1959).

16. Wheelabrator Corp. v. Chafee, 147 U.S. App.D.C. 238, 455 F.2d 1306, 1313 (1971). *See* 4 C.F.R. Part 20 for the bid protest procedures issued by the Comptroller General, and *see generally*, Cibinic and Lasken, The Comptroller General and Government Contracts, 38 Geo.Was.L.Rev. 349 (1970).

17. As the D.C. Circuit specifically noted in *M. Steinthal and Co., supra*, 455 F.2d at 1301, the federal courts must pay particular respect

to what might be fairly called the "common law of government procurement"—the body of rulings determinations emanating from executive officials and the uniquely situated appeals determinations of the Comptroller General and quasi-judicial boards such as the boards of contract appeals in many of the various procurement agencies. Thus the deference normally owed an agency's interpretation of its own authorizing statutes and regulations may in some cases induce a federal court in its sound equity discretion to withhold issuance of the preliminary injunction if the agency can demonstrate the likelihood that its procurement decisions followed accepted agency practice.

18. Kentron Hawaii, Ltd. v. Warner, 156 U.S. App.D.C. 274, 480 F.2d 1166 (1973); *M. Steinthal and Co., supra*, 455 F.2d at 1301; Continental Business Enterprises, Inc. v. United States, 452 F.2d 1016, 196 Ct.Cl. 627 (1971); *Keco Industries, Inc., supra*, 428 F.2d at 1240.

"only upon a showing of 'clear and convincing evidence' of a contrary legislative intent." Abbott Laboratories v. Gardner, 387 U.S. at 141, 87 S.Ct. at 1511.

■■■ 32 C.F.R. § 1–113.2 and Part 141 do not expressly preclude judicial review, but neither do they mandate it. Clearly the absence of statutory language expressly authorizing judicial review is insufficient to offset the presumption that administrative action is reviewable. "Indeed, judicial review of such administrative action is the rule, and nonreviewability an exception which must be demonstrated." Barlow v. Collins, 397 U.S. 159, 166, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970). However, "[a] clear command of the statute will preclude review; and such a command of the statute may be inferred from its purpose." Id. at 167, 90 S.Ct. at 838.

The Government points to those provisions of the regulations which provide that "[a]ny of the prohibitions imposed by these rules may be waived by an Assistant Secretary of a military department or the Director of a defense agency if he determines that a failure to waive the prohibition will be prejudicial to the best interests of the Government," 32 C.F.R. Part 141 (1971) as well as the repeated statement that "[a]ll prospective contractors will be advised of the applicability of the rules by a notice in solicitations and by a clause in resulting contracts," Id., and "[t]he contracting officer shall not impose restrictions under the Appendix in follow-on procurements on any prospective contractor in the absence of a specific contractual agreement with that contractor," 32 C.F.R. § 1–113.2(c) and argue that taken together they amount to such a "clear command" that the regulations are meant to be applied only at the discretion of the agency.

That part of Appendix G which provides for "Review and Waiver" seems to us to grant substantial discretion to procurement officers. Indeed, Hayes concedes that the Air Force could have made the decision to waive the application of the Rules on Avoidance of Organizational Conflicts of Interests. Implicitly the plaintiff also concedes that were such a decision made, it likely would be unreviewable as it would be one of those "rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). We do not pass on that question, however, as such a waiver decision was not made in this case. Rather, the Air Force has determined that the Rules on Avoidance of Organizational Conflicts of Interest are never applicable to the type of engineering contracts which Boeing·held prior to the grant of IRAN/Modification contract 3366. In our view, this construction of the regulations is a decision other than a specific decision to waive the application of the rules in a particular instance, having made the decision that a failure to do so would be "prejudicial to the best interests of the Government."

Such a construction of the regulations "does not significantly engage the agency's expertise," Barlow v. Collins, 397 U.S. at 166, 90 S.Ct. at 837, for "Courts are as expert as administrators in matters of statutory construction." East Oakland-Fruitvale Planning Council v. Rumsfeld, 471 F.2d 524, 529 (9th Cir. 1972). See Barlow v. Collins, 397 U.S. at 166, 90 S.Ct. 832.[19]

**19.** An analogous question would be the extent to which an agency has discretion to construe its own authorizing legislation to determine the extent to which its decisions are to be unreviewable. In such cases, normally the initial inquiry as to the construction of an agency's authorizing legislation is held to be a matter proper for judicial review, even if ultimately the decision is that the agency has unreviewable discretion under that legislation. See East Oakland-Fruitvale Planning Council v. Rumsfeld, supra; Fletcher v. Housing Authority of Louisville, 491 F.2d 793 (6th Cir. 1974). Similarly, " '[w]here the only or principal dispute relates to the meaning of the statutory term' . . . [the controversy] presents issues on which courts, and not [administrators], are relatively more expert." Barlow v. Collins, 397 U.S. at 166, 90 S.Ct. at 837, citing Hardin v. Kentucky Utilities Co., 390 U.S. 1, 14, 88 S.Ct. 651, 19 L.Ed.2d 787 (Harlan, J., dissenting).

Thus the issue in this case comes down to the relatively straightforward one of the extent to which the Department of Defense Rules on Avoidance of Organizational Conflicts of Interests were meant to apply to the type of engineering contracts which Boeing held for the KC–135. The decision that Boeing's sustaining engineering and related support services contracts did not come within the purview of the rules was not made on the basis of the "best interests of the Government," rather the record shows it was made on the basis of a construction of the language of the regulations, and the legislative history surrounding the drafting of the rules. Such matters are eminently fit for judicial review, and while naturally an agency's interpretation of its own regulations is subject to substantial deference,[20] this does not amount to unreviewable discretion within the meaning of § 701(a) of the Administrative Procedure Act.[21]

## IV.

### APPLICABILITY OF THE DEPARTMENT OF DEFENSE RULES ON AVOIDANCE OF ORGANIZATIONAL CONFLICTS OF INTERESTS TO ENGINEERING SUPPORT CONTRACTS

As the Government has had to rely increasingly on the use of private contractors to perform tasks which might previously have been performed by Government employees, the problem of reconciling the private interests of independent contractors with the public mission they are called upon to perform has resulted in substantial legislative concern about conflicts of interest. The problem has been particularly acute concerning use of individual Government employees who have some interest in private concerns, and both the legislation and the literature concerning this question of so-called "individual conflicts of interest" have been extensive.[22] Such "individual conflicts of interest" have been defined as "the clash, or appearance of a clash, between a Government official's interest in performing his official duties and his interests in his private—and especially his private economic—affairs." Association of the Bar of the City of New York, Conflict of Interests in Federal Service, 3 (1960). Here the statutory restrictions are relatively clear, and well understood. The same cannot be said of "organizational conflicts of interest" which have been described by one of the leading scholars in the field as a "more mysterious, arcane subject, on which much less has been published and about which very little that is definitive can yet be said." Pasley, Organizational Conflicts of Interests in Government Contracts, 1967 Wis. L.Rev. 5, 6.

"Organizational conflicts of interest," unlike ones concerning individual employees, normally do not arise in most

20. *See generally,* 4 K. C. Davis, Administrative Law Treatise, § 30.12 (1958).

21. The Government and Boeing argue that by the terms of 32 C.F.R. § 1–113.2 and Part 141, the failure of the Government to include provisions in Boeing's sustaining engineering contracts barring future bidding on IRAN/Modification contracts should preclude retroactive application of the Rules on Organizational Conflicts of Interest. We note without passing on the question that other procurement regulations have been held to be self-enforcing despite the failure to include them in specific contracts, *see, e. g.,* G. L. Christian and Associates v. United States, 312 F.2d 418, 160 Ct.Cl. 1 (1963). Further the Comptroller General has recently decided that the failure to include such a ban in a prior contract need not bar an application of restrictions similar to those of 32 C.F.R. Part 141, if such a restriction is made consistent with 10 U.S.C. § 2304(g) which requires solicitation of proposals "from the maximum number of qualified sources consistent with the nature and requirements of the supplies or services to be procured." Decision of the Comptroller General, B–181448 of October 15, 1974. *See OGC Newsletter,* Office of the General Counsel, Dept. of the Navy, Vol. 21, No. 4 (12/16/74).

22. *See* 18 U.S.C. §§ 201–219 (1964). *See generally,* Manning, Federal Conflict of Interest Law (1964); Perkins, The New Federal Conflict of Interests Law, 76 Harv.L.Rev. 1113 (1963); Petrowitz, Conflict of Interests in Federal Procurement, 29 Law and Contemp. Prob. 196 (1964); Pasley, Individual Conflicts of Interest (Briefing Paper No. 64–4, Federal Publications, Inc.) (1964).

aspects of public service. Rather they have been described as "essentially creatures of federal government contract law and policy, more specifically of research and development contracting and of complex space age technology." Pasley, *Id.*

32 C.F.R. § 1–113.2 and Part 141 were drafted to deal with what a series of Congressional hearings and reports identified as the continuing problem of organizational conflicts of interest in aerospace procurement.[23] At trial the Government introduced witnesses who either participated in the drafting of the regulations in question, or who subsequently were responsible for applying them in military procurement contracts, who testified that the rules were intended to apply to situations where a highly specialized contractor engaged in what was called "systems engineering" and "technical direction."[24] "Systems engineering" is defined by 32 C.F.R. Part 141 to include "a combination of substantially all the following activities: determination of specifications, identification and solution of interfaces between parts of the system, development of test requirements or plans and evaluation of test data, and supervision of design work." The term "technical direction" is similarly defined to include "a combination of substantially all the following activities: preparation of work statements for contractors, determination of parameters, direction of contractors' operations, and resolution of technical controversies." While some of these technical terms seem so conceptually broad as to include some, although certainly not all, of Boeing's responsibilities under its sustaining engineering contracts, Government witnesses at trial testified that the type of post-production engineering which Boeing was expected to perform under its sustaining engineering contracts was qualitatively different from the kind of engineering effort described by the terms "systems engineering" and "technical direction." Typically this latter type of engineering was said to involve development of new systems, and the coordination of the contributions of a number of sub-contractors in an effort to speed research, development and production.

The Government relies not only upon what individuals who participated in the drafting of the regulations suggested was the intent behind the language used within the regulation, but also refers to the specific instances of systems engineering and technical direction which had been identified by Congressional committees investigating organizational conflicts of interest as creating a problem which required a solution.[25]

---

**23.** *See* for his account of the development of the D.O.D. regulations, Pasley, Organizational Conflicts of Interest in Government Contracts, 1967 Wis.L.Rev. 5, 6 et seq. *See also* House Committee on Government Operations, Organization and Management of Missile Programs, H.R.Rep.No.1121, 86th Cong., 1st Sess. (1959); House Committee on Government Operations, Air Force Ballistic Management (Formation of Aero Space Corporation), H.R. Rep.No.324, 87th Cong., 1st Sess. (1961); U.S. Bureau of the Budget, Report to the President on Government Contracting for Research and Development, S.Doc.No.94, 87th Cong., 2nd Sess. (1962); House Committee on Government Operations, Avoiding Conflicts of Interest in Defense Contracting and Employment, H.R.Rep.No.917, 88th Cong., 1st Sess. (1963); Hearings Before the Sub-Committee of the House Committee on Government Operations, Organization and Management of Missile Programs, 86th Cong., 2nd Sess.

(1960); Hearings Before a Sub-Committee of the House Committee on Government Operations, Systems Development and Management, 85th Cong., 1st Sess. (1963).

**24.** Among the other equally ambiguous generic terms used to describe similar functions are: "systems analysis and engineering and technical monitoring and direction," Staff of Sub-Committee for Special Investigations of the House Committee on Armed Services, 89th Cong., 1st Sess., The Aero Space Corporation 7 (Comm.Print.1965) or, more generally, "planning, technical, analytical, or other consulting services." Proposed Atomic Energy Commission, "Statement of General Policy for the Avoidance of Organizational Conflicts of Interest," 31 F.R. 2699, 2700 (1966).

**25.** The prototype of such a contractor was the Ramo-Wooldridge Corporation, later known as the Thompson-Ramo-Wooldridge Corporation, later responsible for the separate

Expert Government witnesses testified that there were fundamental differences between the type of engineering responsibilities involved in developing a new weapon system, and those which are involved in performing maintenance engineering on an existing system. These witnesses testified that contracts let by the Logistics Command simply were not "systems engineering" or "technical direction" contracts within the meaning of the regulations. Sustaining engineering was identified as resembling "fix-it" engineering although the precise conceptual differences between such "fix-it" engineering and the "very sophisticated type of technical management" which was said to be involved in systems engineering and technical direction were left largely unarticulated.

The plaintiff produced no evidence as to the intent of the draftsman of 32 C.F.R. § 1–113.2 and Part 141, nor any evidence as to how the terms "system engineering" and "technical direction" are viewed by specialists in military procurement. Rather Hayes simply says that to read the language of the regulation is enough, that the words are so clear no extrinsic evidence is required. However, it only requires a single attempt to read and understand the cabalistic jargon of the regulations to conclude that the words cannot stand alone.

We do not feel that the plaintiff has offset the weight we attach to the administrative interpretation of the regulations and to the intent attributed to the draftsman of the regulation by participants in the drafting process. One such participant in the drafting process, then a special assistant to the Secretary of Defense, has described the problems the regulations were designed to solve. Yarmolinsky, Organizational Conflicts of Interest, 24 Fed.B.J. 309 (1964). He describes the development of "systems engineering and technical direction" as responding to a need which arose "because weapons systems had become so complex that the job of fitting together separate systems, sub-systems, and sub-sub-systems, turned out to be at least as important as the job of producing component elements. Contractors were needed to perform what came to be called systems engineering and technical direction, which amounted to giving the contractor a very large say in what the ultimate customer—the Government—was going to buy."

We are thus unable to read 32 C.F.R. § 1–113.2 and Part 141 so broadly as to encompass all engineering tasks assigned by contract by the military. Such a reading is inconsistent with the background to the drafting of the regulation, and has never been the interpretation placed upon it by the agencies responsible for military procurement. In our view, the limited reading placed on the regulations by the various procurement agencies is consistent with the legislative materials which prompted the drafting of the regulation originally, and with the attempted solution of the specific problem those legislative hearings and reports documented.

We thus conclude that the Air Force's administrative interpretation of 32 C.F.R. § 1–113.2 and Part 141 is a per-

incorporation of Space Technology Laboratories, a wholly-owned subsidiary of Thompson-Ramo. The history of these corporations, and their role in developing the ballistic missile system for the Air Force are extensively reported in two House of Representative's reports, H.R.Rep.No.1121, and H.R.Rep.No.324, *supra,* note 23. Ramo-Wooldridge was responsible for the coordination of sub-contracting in the development of the ballistic missile system—and as such had enormous influence in making decisions about what equipment and services should be acquired by the Government. It seems plain to us that if what Ramo-Wooldridge was performing in the late '50s is what the terms "systems engineering" and "technial direction" were meant to describe, then Boeing's sustaining engineering contracts bear no meaningful relationship to the type of engineering responsibilities vested by the Air Force in the Ramo-Wooldridge Corporation.

missible interpretation, and we do not disturb it.[26]

Accordingly, we affirm the judgment of the trial court.

---

26. The plaintiff proposes an alternative basis on which it seeks to have contract 3366 voided. Relying on what it identifies as the rationale of United States v. Mississippi Valley Generating Co., 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), the plaintiff proposes that a general public policy against conflicts of interest is sufficiently strong to justify voiding a contract which arguably is tainted by such a conflict of interest. We feel we must decline the invitation to develop such a novel "federal common-law of Government procurement," premised upon what a court can be persuaded is desirable procurement policy.

No authority is cited for this dramatic use of federal equity power save the *Mississippi Valley Generating* case, and it is admittedly distinguishable on the grounds that it involved the violation of a penal conflict of interest statute, and thus did not require a decision to void a Government contract premised solely on the Court's intuitive sense of what is desirable public policy. The penal statute in question, 18 U.S.C. § 434 was said to be given its "fair meaning in accord with the evident intent of Congress," 364 U.S. at 550, 81 S.Ct. at 309, and the Supreme Court by its own terms did nothing more than construe that intent. We find nothing in the case which authorizes so broad a use of discretionary power as to justify creating new and novel limitations on military procurement.