UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. 91-5097

RAPIDES REGIONAL MEDICAL CENTER,

Plaintiff, Intervenor-Defendant-Appellee,

versus

SECRETARY, DEPARTMENT OF VETERANS' AFFAIRS,

Defendant, Intervenor-Defendant-Appellant,

and

ST. FRANCES CABRINI HOSPITAL,

Movant, Intervenor-Plaintiff-Appellant.

_____

Appeals from the United States District Court
for the Western District of Louisiana
_____

(September 24, 1992)

Before GOLDBERG, JONES, and DeMOSS, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The centerpiece of this dispute is a dual energy linear accelerator, a sophisticated radiation therapy device used on cancer patients. Two hospitals in Rapides Parish, Louisiana -- one private, the other operated by the Department of Veterans Affairs (VA) -- entered into a "sharing agreement" for the acquisition and joint use of such an accelerator. Under the agreement, the Alexandria Veterans Affairs Medical Center (VAMC) would procure the accelerator, with nearby St. Francis Cabrini Hospital (Cabrini)

donating one-half the cost of the machine to the VAMC.[1] The VAMC-owned accelerator would then be housed at Cabrini and available for use by both institutions. Shortly before negotiations over the sharing agreements had been completed, neighboring Rapides Regional Medical Center (Rapides) got wind of the deal and sought to block it. Rapides, which operates two linear accelerators of its own, and which currently provides accelerator and related services to the VAMC,[2] charged that the sharing agreement violated the Competition in Contracting Act of 1984 (CICA), 41 U.S.C. § 251 <u>et. seq.</u>, because it was never subjected to public bidding. After an administrative appeal dismissed as untimely by the Comptroller General,[3] Rapides won a permanent injunction against the sharing agreement in district court. <u>Rapides Regional Medical Center v. Derwinski</u>, 783 F.Supp. 1006 (W.D. La. 1991). Both the VA and

---

[1] The VAMC-Cabrini agreement consisted of: (1) a Letter of Intent between the VAMC and Cabrini; (2) a Memorandum of Understanding between the two facilities ("MOU"), requiring Cabrini to donate one-half the cost of the accelerator -- approximately $750,000 -- to the VAMC in exchange for housing and operating it at Cabrini; (3) a proposed sharing agreement, governing the joint use of the accelerator and providing for Cabrini to render certain related services to VAMC and its patients; and (4) a cost analysis for the accelerator.

[2] From March 1985 to the period relevant to this lawsuit, the VAMC contracted with Rapides for radiation therapy using Rapides' accelerator. In late 1989, VA officials, apparently concerned that Rapides was charging too much for the use of its accelerator and related services, began exploring possible alternatives. When the VA learned that Cabrini was planning to acquire its own accelerator, it entered into negotiations for a possible sharing agreement, culminating in the signing of the MOU in August 1990. Rapides estimates that its contract with the VA accounts for twenty percent (20%) of its total revenue from radiation therapy services.

[3] <u>Rapides Regional Medical Center</u>, No. B-242601, 91-1 C.P.D. ¶ 159 (Feb. 12, 1991), <u>reconsideration denied</u>, <u>Rapides Regional Medical Center -- Reconsideration</u>, No. B-242601.2, 91-1 C.P.D. ¶ 614 (June 28, 1991).

Cabrini, which had intervened in those proceedings, appealed the district court's decision, and we granted expedited review.

## I.

### STATUTORY BACKGROUND

Before discussing the merits of this case, it may be helpful to trace its statutory contours. Rapides asserts that the Competition in Contracting Act governs this action. Appellee alleges, and the district court agreed, that the VAMC-Cabrini sharing agreement violates CICA's general requirement that federal procurement contracts be awarded competitively.[4] CICA responded to Congressional findings that many federal procurement contracts were

---

[4] CICA provides in relevant part:

(1) Except as provided in subsection (b), (c), and (g) of this section and except in the case of procurement procedures otherwise expressly authorized by statute, an executive agency in conducting a procurement for property or services --

(A) shall obtain full and open competition through the use of competitive procedures. . . and
(B) shall use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

(2) In determining the competitive procedures appropriate under the circumstance, an executive agency--

(A) shall solicit sealed bids if--

(i) time permits the solicitation, submission, and evaluation of sealed bids;

(ii) the award will be made on the basis of price and other price-related factors;

(iii) it is not necessary to conduct discussions with the responding sources about their bids; and

(iv) there is a reasonable expectation of receiving more than one sealed bid; and

(B) shall request competitive proposals if sealed bids are not appropriate under clause (A).

41 U.S.C. § 253(a).

3

awarded on a sole-source basis, resulting in widespread inefficiencies and wasteful government spending. According to its drafters, the Act's objectives were "to establish a statutory preference for the use of competitive procedures in awarding federal contracts for property or services, to impose restrictions on the awarding of noncompetitive contracts, and to permit federal agencies to use the competitive method most conducive to the conditions of the contract." S. Rep. No. 50, 98th Cong., 2d Sess., reprinted in 1984 U.S. Code Cong. & Admin. News 2174, 2180.

The VA does not contend that its sharing agreement with Cabrini falls within any of the seven enumerated exceptions to CICA that permit sole-source procurement.[5] However, both Cabrini and the VA would find refuge in the savings clause to § 253(a)(1), which exempts from CICA "procurement procedures otherwise expressly authorized by statute." As asserted proof of this authority, appellants cite 38 U.S.C. § 8153, empowering the VA to enter into

---

[5] On appeal, Cabrini attempts to avail itself of the exception provided by § 253(b)(1)(A), which provides:

**(b) exclusion of particular source; restriction of solicitation to small business concerns**

(1) An executive agency may provide for the procurement of property or services covered by this section using competitive procedures but excluding a particular source in order to establish or maintain any alternative source or sources of supply for that property or service if the agency head determines that to do so--

(A) would increase or maintain competition and would likely result in reduced overall costs for such procurement, or for any anticipated procurement, of such property or services[.]

By its own terms, however, subsection (b)(1)(A) applies only to agencies that are already "using competitive procedures." The VA stipulated before the district court that it did not use competitive procedures when it entered into the sharing agreement with Cabrini. In any event, Cabrini raises this argument for the first time on appeal, and we will not consider it here.

4

sharing agreements for the acquisition and joint use of advanced medical technology.[6]

Congress initially authorized the sharing program set forth in § 8153 "for the exchange of use (or under certain conditions the mutual use) of specialized medical facilities between Veterans' Administration hospitals and other public and private hospitals or medical schools in a medical community."  S. Rep. No. 1727, 89th Cong., 2d Sess., reprinted in 1966 U.S. Code

---

[6]    Section 8153 provides:

(a)    To secure certain specialized medical resources which otherwise might not be feasibly available or to effectively utilize certain other medical resources, the Secretary may, when the Secretary determines it to be in the best interest of the prevailing standards of the Department medical care program, make arrangements, by contract or other form of agreement, as set forth in clauses (1) and (2) below between Department health-care facilities and other health-care facilities (including organ banks, blood banks, or similar institutions), research centers, or medical schools:

(1)    for the mutual use, or exchange of use, of specialized medical resources when such an agreement will obviate the need for a similar resource to be provided in a Department health care facility; or

(2)    for the mutual use, of specialized medical resources in a Department health care facility, which have been justified on the basis of veterans' care, but which are not utilized to their maximum effective capacity.

(b)    Arrangements entered into under this section shall provide for reciprocal reimbursement based on a methodology that provides appropriate flexibility to the heads of the facilities concerned to establish an appropriate reimbursement rate after taking into account local conditions and needs and the actual costs of the providing facility of the resource involved.  Any proceeds to the Government received therefrom shall be credited to the applicable Department medical appropriation and to funds that have been allotted to the facility that furnished the resource involved.

. . .

(e)    The Secretary shall submit to the Congress not more than 60 days after the end of each fiscal year a report on the activities carried out under this section.

Cong. & Admin. News 4210, 4219-20. In 1985, after CICA's enactment, Congress expanded the sharing program to other medical facilities, appropriating up to $10 million for a pilot program in which VA facilities would purchase advanced medical equipment so long as non-federal sources agreed to finance at least fifty percent (50%) of the acquisition costs. Conf. Rep. No. 363, 99th Cong., 1st Sess. 22 (Nov. 8, 1985). According to the Senate Appropriations Committee:

> The purpose of this funding is to help the VA to acquire costly, advanced state-of-the-art medical equipment more easily and to provide a means of using that equipment to maximum effectiveness by encouraging long-term sharing with community institutions. . . . The Committee recognizes that there are limits to what medical communities and the Federal Government can individually accomplish, but believes that this proposed arrangement will provide VA beneficiaries and the VA medical centers and community medical institutions with access to prohibitively expensive major medical equipment which would otherwise not be available to either.

S. Rep. No. 99-129, 99th Cong., 1st Sess. 82, 88-89 (Aug. 28, 1985).[7]

Shortly after Congress began funding the sharing program, the Veterans Administration (predecessor to the Department of Veterans Affairs) promulgated interim rules to implement CICA. See 51 Fed. Reg. 23065-73 (June 25, 1986). Significantly, the VA stipulated that "[s]haring contracts negotiated under 38 U.S.C. § 5053 are approved for other than full and open competition." Id.

---

[7] Congress authorized the expanded sharing program, which is officially known as the Advanced Technology Medical Equipment Acquisition and Sharing Program, in 1990. See Pub. L. 101-366, Title II, § 202 (b), Aug. 15, 1990, 104 Stat. 438. However, the above-cited Conference Report, see Conf. Rep. No. 363, id., indicates that Congress began funding the sharing program as early as 1985 -- nearly five years before it was formally authorized.

at 23066.[8]  The VA explained that its "[j]ustification and approval procedures for proposed noncompetitive acquisitions . . . are critical in effectively implementing the CICA and will provide the basis for compiling the VA annual report to Congress."  Id. at 23065.  The VA's interim rules were finalized and implemented in 1987.  See 52 Fed. Reg. 28559, 28560 (July 31, 1987).[9]

To summarize:  Congress first adopted the VA sharing program in 1966.  The program as enacted did not address competitive procurement procedures.  Congress enacted CICA in 1984, creating a statutory presumption in favor of competition "except in the case of procurement procedures . . . expressly authorized by statute."  The following year, Congress expanded the sharing program by appropriating funds to finance the acquisition and joint use of advanced medical equipment along the lines of the VAMC-Cabrini agreement.  In response, the VA in 1987 implemented regulations providing that despite CICA's enactment, the sharing program did not require full and open competition.  Finally, Congress amended the sharing program in 1990 at what is now § 8153, expanding the existing program substantially but making no mention of CICA.

Against this statutory backdrop, the district court permanently enjoined the VAMC-Cabrini agreement after holding that

---

[8]  38 U.S.C. § 5053 was later recodified as § 8153.  See Pub. L. 102-40, Title IV, § 402(b)(1), May 7, 1991, 105 Stat. 238.  As earlier noted, the 1990 program set forth in what is now § 8153 is an expansion of the original VA sharing program, first enacted in 1966 as § 5053.

[9]  See also 48 C.F.R. 806.302-5(b) (1991).

Congress did not explicitly exempt the sharing program from CICA when it amended § 8153 in 1990. While acknowledging the VA regulation set forth at 48 C.F.R. 806.302-5(b), which exempts the sharing program from CICA, the court noted:

> 48 C.F.R. 806.302-5(b) . . . antedates [sic] the rather precise statutory language of "otherwise expressly authorized by statute" as founded in 41 U.S.C. § 253(a). Congress said that the public bid law can be circumvented by express language contained in a statute. The regulation from the Veterans Administration is not a statute. Congress created the measuring stick and retained the power to delete public bid law requirements from contracts for goods and services. The VA is powerless to change the clear procedure set by Congress.

783 F.Supp. at 1008. The district court did not address the pre-CICA legislative history of § 8153, nor did it review the 1985 appropriations legislation expanding the existing sharing program to private hospitals.

Cabrini and the VA argue that Congress never intended the Competition in Contracting Act to apply to a sharing program that has been on the books since 1966. The program is either exempted from the Act by § 8153, they contend, or falls outside CICA because sharing agreements do not involve the "procurement" of equipment. Appellants also challenge Rapides' standing to sue. We address these arguments in reverse order.

## II.

### STANDING

Cabrini and the VA first contend that the district court erred in failing to enter a specific finding that Rapides has standing to bring this lawsuit. They insist on a remand or, in the

8

alternative, a ruling that as a matter of law Rapides lacks standing to sue. Appellants acknowledge that disappointed bidders have prudential standing under the Administrative Procedure Act to challenge agency violations of federal procurement requirements. See Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859, 873 (D.C. Cir. 1970); Hayes International Corp. v. McLucas, 509 F.2d 247, 257 (5th Cir.), cert. denied, 423 U.S. 864, 96 S. Ct. 123, 46 L.Ed.2d 92 (1975) (adopting Scanwell). They maintain, however, that Rapides lacks standing because it is neither an actual nor a prospective bidder on the VA's plan to acquire a linear accelerator.[10] Establishing prudential standing to challenge a government contracting decision requires: (1) an allegation of injury in fact; (2) a claim that CICA was "arguably" intended to prevent the agency's action; and (3) the absence of Congressional intent to withhold judicial review. Contractors Engineers International, Inc. v. Dept. of Veterans Affairs, 947 F.2d 1298, 1300 n.9 (5th Cir. 1991); Gull Airborne Instruments, Inc. v.

---

[10] The disappointed bidder requirement stems from the familiar "zone of interests" test mandated by the Administrative Procedure Act. The APA waives the sovereign immunity to which government agencies would otherwise be entitled for all persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute. . . ." 5 U.S.C. § 702. In its complaint, Rapides premised jurisdiction on 28 U.S.C. § 1331 (federal question jurisdiction) and 31 U.S.C. § 3556 (permitting "any interested party" to challenge alleged violations of federal procurement law). The VA suggests that Rapides erred by failing to tie jurisdiction in this case directly to the APA. But as the VA candidly admits elsewhere in its brief, "it does not matter whether the suit is thought of as an APA action or an action brought directly under CICA, so long as it is clear that the plaintiff must be an actual or prospective bidder in order to have standing." See, e.g., Waste Management of North America v. Weinberger, 862 F.2d 1393, 1397-98 (9th Cir. 1988); and MCI Telecommunications Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989). Neither the VA nor Cabrini challenges Rapides' constitutional standing to bring this action. See generally Scanwell Laboratories, 424 F.2d at 871-73.

9

<u>Weinberger</u>, 694 F.2d 838 (D.C. Cir. 1982) (citing <u>Control Data Corp. v. Baldridge</u>,[11] 655 F.2d 283, 288-89 (D.C. Cir.), <u>cert. denied</u>, 454 U.S. 881, 102 S. Ct. 363, 70 L.Ed.2d 190 (1981)). We are convinced that "[s]atisfaction of the first factor is clear from the preceding discussion, and there is no clear and convincing Congressional intent to withhold judicial review." <u>Abel Converting, Inc. v. United States</u>, 679 F.Supp. 1133, 1137 (D.D.C. 1988). As for the second requirement, assuming that the sharing agreement was covered by CICA, that statute supplies its own answer:

> 'Interested party', with respect to a contract or proposed contract . . . means an <u>actual or prospective bidder or offeror</u> whose direct economic interest would be affected by the award of the contract or by failure to award the contract[.]

31 U.S.C. § 3551(2) (emphasis added).

Thus, to object to the award of a contract allegedly covered by CICA, Rapides must demonstrate that it was an actual or prospective bidder or offeror on the sharing agreement. Because Rapides was not an actual bidder, the prudential standing issue turns on its claimed status as a prospective bidder. Appellants insist that the district court never addressed this issue, asserting that Rapides would not have bid on the sharing agreement had it been given the opportunity to do so. This is unpersuasive. Implicit in the district court's holding that Rapides was denied

---

[11]    <u>Baldridge</u> has since been questioned by <u>Clarke v. Securities Industry Ass'n</u>., 479 U.S. 388, 107 S. Ct. 750, 93 L.Ed.2d 757 (1987), on grounds that are not relevant here.

10

the opportunity to participate in the sharing agreement is the recognition that Rapides would have done so if given the chance. There is sufficient evidence in the record that Rapides stood ready and willing to participate in the sharing program had it been offered the opportunity to do so. In suggesting otherwise, appellants ignore not only the specific allegations in Rapides' verified complaint, but the affidavit of its president, James T. Montgomery, who stated that "[h]ad Rapides Regional been given the opportunity, Rapides Regional would have submitted a proposal to VAMC in connection with consideration of submissions under the 1990 Advanced Medical Equipment Share Acquisition Program. . . ."[12] While appellants point to some evidence that might be interpreted as disproving Rapides' intent to participate in the sharing agreement with the VAMC if offered the chance, the district court's implied factfinding is not clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Had the district court been convinced that Rapides' real motive was to block the VA-Cabrini deal rather than to make a competing offer, it would have had to deny standing, because Rapides would not then be an actual or prospective bidder. This

---

[12] Admittedly, Rapides sought to block the VAMC-Cabrini agreement after it had been executed, writing letters to Members of Congress and others asserting that the new linear accelerator was duplicative and unnecessary. But this last-ditch lobbying effort does not controvert Rapides' contention that it would have bid on the sharing agreement at the outset, before the negotiations were a fait accompli.

11

conclusion was not compelled by the evidence, and we decline to overturn the court's finding.[13]

### III.

### PROCUREMENT

Appellants next confront CICA directly by arguing that the shared acquisition of specialized medical resources[14] for mutual use under § 8153 is not a "procurement" within the meaning of CICA,[15] but more closely resembles a lease or sale of government property. The VA cites several decisions of the Comptroller General to this effect.[16] In particular, the VA directs this

---

[13] We need not and do not here decide that any prospective or actual bidder necessarily has standing to challenge a government procurement decision arguably governed by CICA. Compare Waste Management of N. America v. Weinberger, 862 F.2d 1393, 1397-98 (9th Cir. 1988). Affirmance of the district court is based on Rapides' evidence that it could and would participate in the program if offered the opportunity and that its self-interest dictated such a decision because of its previous arrangement to supply other radiation therapy services to the VA. Cabrini also argues that Rapides waived its claim by failing to file a timely protest with the Comptroller General, the federal official charged with hearing bid protests at the administrative level. This argument wrongly assumes that the Comptroller General has exclusive jurisdiction to hear CICA protests. In fact, the statute expressly provides otherwise. See 31 U.S.C. § 3556 (stating that administrative remedies under CICA are non-exclusive).

[14] As defined by 38 U.S.C. § 8152(2):

> The term "specialized medical resources" means medical resources (whether equipment, space, or personnel) which, because of cost, limited availability, or unusual nature, are either unique in the medical community or are subject to maximum utilization only through mutual use.

[15] CICA applies only to an executive agency conducting a "procurement for property or services." 41 U.S.C. § 253(a)(1).

[16] See Jefferson Bank & Trust, No. B-228563, 87-2 C.P.D. ¶ 390 (Oct. 23, 1987) (government agency's leasing of government-owned office space is not a procurement and therefore subject to CICA); Crystal Cruises, Inc., No. B-238347, 90-1 C.P.D. ¶ 141 (Feb. 1, 1990) (government award of a concession permit allowing a shipping company to operate within a national park is a license to enter government property, not a procurement of property or services under CICA); and Columbia Communications Corp., No. B-236904, 89-2

12

court's attention to <u>Surface Alloys Corp.</u>, B-222703, 86-2 C.P.D. ¶ 7 (June 25, 1986). That case involved a controversy not unlike this one. The U.S. Navy purchased a complicated piece of equipment known as an ion implanter and leased it to a private company that was performing research and development under a Navy contract. Another company protested this action, arguing that it gave the Navy's contractor an unfair competitive advantage. The Comptroller

---

C.P.D. ¶ 242 (Sept. 18, 1989) (NASA did not procure property or services within the meaning of CICA by permitting private contractor to use government satellite).

The degree of deference to be paid to decisions of the Comptroller General is a matter of some dispute. According to one treatise:

> There is an increasing tendency on the part of United States district courts and United States Circuit Courts of Appeal to refer bid protest cases to the General Accounting Office because of that agency's "special competence and experience." This tendency is not followed in the United States Claims Court, which is the most prestigious court in the area of government contracting. It would seem that the United States Court of Appeals for the District of Columbia Circuit is of the view that a decision of the General Accounting Office may not be reversed unless it is "arbitrary and capricious," <u>Steinthal & Co., Inc. v. Seamans</u>, 455 F.2d 1289 (D.C. Cir. 1971). However, the majority of district courts are of the opinion that the decisions of the Comptroller General are advisory only and are not binding upon the court.

McBride & Touhey, 1A GOVERNMENT CONTRACTS at § 7.10. Appellants urge us to afford <u>Chevron</u> deference to Comptroller General decisions interpreting statutes entrusted to the GAO by Congress. <u>See</u> <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 104 S. Ct. 2778, 81 L.Ed.2d 694 (1984). Even our pre-<u>Chevron</u> decisions indicate that "[w]hen actions of procurement officials have been expressly validated by considered decision of the GAO or are in compliance with a reasonably consistent pattern of GAO determinations, the court should be extremely reluctant to overturn such decisions." <u>Kinnett Dairies, Inc. v. J.C. Farrow</u>, 580 F.2d 1260, 1272 (5th Cir. 1978). <u>See</u> <u>also</u> <u>J.H. Rutter Rex. Mfg. Co., Inc. v. United States</u>, 706 F.2d 702, 711 (5th Cir.), <u>cert. denied</u>, 464 U.S. 1008, 104 S. Ct. 526, 78 L.Ed.2d 709 (1983) ("[D]ecisions of the Comptroller General are entitled to special deference given the complexities and intricacies of government purchasing decisions.").

13

General dismissed the protest, holding that the lease was not a procurement under CICA.

While the district court in this case did not define "procurement" for purposes of CICA, its holding rests on the tacit assumption that a procurement has taken place. The question thus remains: Did the VA "procure" goods or services from Cabrini and in so doing run afoul of CICA?

For the answer, one must first examine the Memorandum of Understanding between Cabrini and the VAMC. It outlines several stages for the acquisition and mutual use of the linear accelerator: (1) the actual purchase of the accelerator by the VA from the manufacturer; (2) a financing arrangement whereby Cabrini will donate one-half of the accelerator's cost to the VA;[17] and (3) the joint use of the machine by the VA and Cabrini under the terms of the sharing agreement to be negotiated at a later date.[18] The VA emphasizes that the accelerator was purchased from the manufacturer using competitive procurement procedures, whereas the financing and shared use of the VA-owned accelerator is akin to a

---

[17] Such donations are authorized at 38 U.S.C. § 8303. The amount of the donation at issue in this case (fifty percent of the purchase price of the accelerator) is consistent with the pilot program established by Congress. See Conf. Rep. No. 363, 99th Cong. 1st Sess. at 22.

[18] VA's brief takes pains to observe that "there is as yet no agreement to procure such services [from Cabrini]. If the VA contracts for such services from Cabrini, that would be a procurement, and Rapides might well have standing to challenge it." VA contends, however, that under § 8153, such a transaction would still not be subject to CICA.

lease or sale of government property.[19]  For its part, Rapides argues that the transaction must be viewed as an integrated whole: the shared acquisition of property (the linear accelerator) as well as services (including Cabrini's facilities, personnel and other specialized medical services).  To bolster its argument, Rapides cites Motor Coach Industries, Inc. v. Dole, 725 F.2d 958 (4th Cir. 1984) and Yosemite Park v. United States, 582 F.2d 552 (Ct. Cl. 1978).

In Motor Coach Industries, the Fourth Circuit held that a trust formed by the Federal Aviation Administration to fund ground transportation improvements at Dulles International Airport was public in character, so that CICA applied to all such improvements financed by that trust.  To fund the trust, the FAA agreed to waive air carrier fees at Dulles provided that the airlines deposited equivalent funds in the trust.  After analyzing the trust's purpose, the court declared it to be a disguised "purchasing agent" created to circumvent normal appropriation channels and the federal procurement process.  Id. at 968.  While Rapides insists that the VA-Cabrini sharing agreement is also an "end-run" around the procurement requirements of CICA, id., Motor Coach Industries is plainly distinguishable.  Unlike the FAA trust, the circumstances surrounding the sharing program do not suggest any attempt to evade statutory purchase requirements.  The question

_____

[19]     Cabrini takes a slightly different position:  that the VA's procurement of the linear accelerator "has not been challenged" so that CICA applies -- if at all -- solely to that portion of the MOU by which Cabrini is to provide accelerator-related services to VA clients.

here is whether the sharing agreement expressly permitted by § 8153 was for that reason not required to comply with CICA. Further, the VAMC-Cabrini agreement does not resemble the concession contract at issue in Yosemite Park. The National Park Service contracted directly for transportation equipment and services under the guise of a "concession" agreement conferring federal tax breaks on the contractor. In holding that the contractor was bound by federal procurement laws, the court rejected the NPS's efforts to evade those requirements by labeling what was in fact "the purchase of services" as a "concession." 582 F.2d at 558-59. The common thread in both cases, absent here, is an arrangement by the federal government to pay money or confer other benefits in exchange for goods and services. Under the MOU, and under § 8153, the VA received a donation of money from Cabrini in exchange for the shared use of a linear accelerator purchased and owned by the VAMC.

Rapides nonetheless insists that the definition of "procurement" under CICA is broad enough to encompass the VAMC-Cabrini sharing agreement. What is at stake here, Rapides insists, is no less than "a sole-source joint purchase and shared use agreement that falls squarely within the statutory definition of procurement." And there lies the rub: Rapides pins its hopes on a statutory definition of "procurement" that is inapplicable to CICA. Specifically, Rapides cites 41 U.S.C. § 403, which provides in relevant part:

As used in this chapter --

16

> (2) the term "procurement" includes all stages of the process of acquiring property or services, beginning with the process of determining a need for property or services and ending with contract completion and closeout[.]

(Emphasis added.) The crucial phrase in this passage, "As used in this chapter," means that § 403(2) applies exclusively to Chapter 7 of Title 41. Chapter 7, The Office of Federal Procurement Policy Act, 41 U.S.C. § 401 et. seq., establishes the Office of Federal Procurement Policy within the Office of Management and Budget "to provide overall direction of procurement policies, regulations, procedures, and forms for executive agencies in accordance with applicable laws." 41 U.S.C. § 402(b). In contrast, the full and open procurement requirements of CICA § 253(a) are set forth in Chapter 4. It stands to reason that the definition of procurement for purposes of Chapter 7, which establishes an agency in the executive branch whose mission is to oversee federal procurement policy, is considerably broader than the definition of procurement subject to the particularized bidding and negotiation requirements specified by CICA. Indeed, had Congress wanted the definition of procurement articulated in Chapter 7 to apply to Chapter 4, it could have done so in express terms.[20]

---

[20] See, e.g., 41 U.S.C. § 253(g)(5) (Supp. 1992) (providing that "[i]n this subsection, the term 'small purchase threshold' has the meaning given such term in section 403(11) of this title"). Rapides' reliance on Hayes v. U.S. Postal Service, 859 F.2d 354 (5th Cir. 1988), is similarly misplaced. Hayes interpreted the definition of "procurement of services" under the Contract Disputes Act, 41 U.S.C. § 601 et. seq., rather than CICA. Id. at 355-56. Hayes also deals with a "procurement" of suggestions by the government from its employees.

If anything, Congress' efforts to define "procurement" for purposes of the Office of Federal Procurement Policy Act suggest that the meaning of this term differs elsewhere in Title 41. CICA itself does not define procurement. Nor, for that matter, does the Federal Acquisition Regulations System (FAR), of which 48 C.F.R. 806.302-5(b) -- the VA's rules exempting the sharing program from CICA -- is a part.[21] However, there can be little doubt that the word procurement is widely understood, by lawyers and laymen alike, to denote the process by which the government pays money or confers other benefits in order to obtain goods and services from the private sector. Black's Law Dictionary defines "procurement contract" as "[a] government contract with a manufacturer or supplier of goods or machinery or services under the terms of which a sale or service is made to the government." BLACK'S LAW DICTIONARY 1208 (6th ed. 1991). Rapides does not dispute that the VA procured the linear accelerator from a private manufacturer, in a procurement process that complied with CICA. What Rapides fails to explain is why an agreement over future access to government-owned property, albeit property purchased partly with a private donation from Cabrini, justifies expanding the definition of "procurement" beyond its generally understood meaning. Rapides tries to sidestep the issue by asserting that it would have given a larger donation to the VAMC to purchase the accelerator, although the district court made no findings on this point. But this does not change the fact that the VA never

---

[21]    See 48 C.F.R. 2.101 et. seq. (defining terms used by the FAR).

18

intended to procure the accelerator from either Cabrini or Rapides. To repeat, the classic procurement involves the government's paying money or conferring other benefits in return for the acquisition or use of private property or services. This is decidedly unlike the agreement at issue here in which the VA has received money from a private hospital and used it to purchase a linear accelerator from the manufacturer, in exchange for letting that hospital share its use.

## IV.

### EXPRESS AUTHORIZATION

Finally, even assuming that the VAMC-Cabrini sharing agreement is a "procurement" for purposes of CICA, we are persuaded that 38 U.S.C. § 8153, which authorizes the VA to enter into such arrangements, is a procurement procedure "expressly authorized by statute" within the meaning of CICA § 253(a)(1) and therefore is not subject to the Act's full and open competition requirements.

As has been already noted, Congress originally enacted what is now § 8153 in 1966, nearly two decades before the passage of the Competition in Contracting Act. In 1985, the year after CICA's enactment, Congress expanded the sharing program by appropriating up to $10 million for a pilot program to facilitate sharing agreements like the one later negotiated between Cabrini and the VAMC. Congress evidently saw no reason to revisit § 8153

19

after CICA's enactment because the sharing program had historically been operated on a sole-source basis.[22]

Moreover, the language of § 8153 is inconsistent with the district court's conclusion that the VA's sharing arrangements must be achieved competitively. For instance, § 8153(b) provides that reimbursement for the shared use of equipment must be based "on a methodology that provides appropriate flexibility to the heads of the facilities concerned," taking into account "local conditions and needs and the actual cost to the providing facility of the resource involved." This bears little resemblance to competitive bidding procedures in which the participating government agency attempts to ensure a steady supply and minimize its costs without taking into account added considerations affecting private contractors. Further, § 8153(e) directs the Secretary of Veterans Affairs to notify Congress annually "on the activities carried out under this section." The reporting requirement, which permits Congress to monitor sharing arrangements such as that between Rapides and the VAMC, would suggest that Congress sought to ensure fairness and efficiency in such unique arrangements by means other than competitive bidding.

We also disagree with the district court as to the proper role of 48 C.F.R. 806.302-5(b), which provides that "[s]haring contracts negotiated under [§ 8153] are approved for other than

---

[22] The sharing program as enacted by Congress was not subject to competitive procurement requirements. The Comptroller General later recognized the VA's authority under what was then § 5053 to approve such sharing arrangements on a non-competitive basis. See Veterans Admin. No., No. B-115559.2, 81-2 C.P.C. ¶ 369 (Nov. 2, 1981).

20

full and open competition." Admittedly, this regulation, which was implemented after CICA's enactment, "is not a statute." 783 F.Supp. at 1008. But while the district court correctly observed that this regulation was promulgated after the enactment of CICA, the court erred by implying that the VA was attempting to circumvent Congressional intent by exempting the sharing program from § 253(a)(1). On the contrary, the VA regulation was implementing Congress' post-CICA appropriations legislation that expanded funding for the sharing program so long as non-federal sources agreed to finance at least 50 percent of the cost of acquiring advanced medical equipment.[23] We therefore can discern no valid reason why 806.302-5(b) should not be controlling.[24] Rapides is certainly correct that "[t]he VA cannot unilaterally exempt itself from the Congressional mandate of the CICA," but such is not the case here. That Congress did not specifically exempt the sharing program from CICA in 1990, when it amended what was then § 5053, is not especially surprising given that Congress had created and maintained that program by means other than full and open procurement. Congress retained for itself the "measuring stick," 783 F.Supp. 1008, by which to evaluate the success of the sharing program now recodified at § 8153: annual reports from the

---

[23] See Conf. Rep. No. 363, 99th Cong., 1st Sess. at 22; and S. Rep. No. 99-129, 99th Cong., 1st Sess. at 88-89.

[24] Nor are we alone in reaching this conclusion. The Comptroller General determined in this dispute that § 8153 sharing arrangements are not subject to the full and open competition requirements of CICA. See Rapides Regional Medical Center -- Reconsideration, No. B-242601.2, 91-1 C.P.D. ¶ 614 (June 28, 1991). The district court's opinion does not refer to this decision, and it is therefore unclear what, if any, deference it paid to the GAO's analysis and considered judgment.

VA tracking activities under the program. Section 8153(e), which reflects Congress' willingness to exercise its oversight function, belies the district court's claim that the VA was attempting to circumvent Congressional priorities by promulgating 806.302-5(b).

In view of the plain language of § 8153, its pre-CICA legislative history, and the 1985 appropriations legislation expanding the existing sharing program (and which 48 C.F.R. 806.302-5(b) was intended to implement), it must be concluded that the VA's sharing program is expressly authorized by statute within the meaning of CICA § 253(a)(1) and therefore does not trigger the Act's full and open competition requirements.

## V.

## CONCLUSION

For all the foregoing reasons, we **REVERSE** the district court's decision. The permanent injunction barring the VAMC-Cabrini Memorandum of Understanding is **VACATED.**